Filed 1/4/17 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DAVID PEREZ,<br><br>        on Habeas Corpus. | A145279 & A148392<br><br>(Solano County Super. Ct.<br> No. FCR313210)<br><br>**ORDER MODIFYING OPINION**<br>**AND DENYING REHEARING**<br>**NO CHANGE IN JUDGMENT** |

**THE COURT:**

It is ordered that the opinion filed herein on December 29, 2016, be modified as follows:

On page 42, at the bottom of the first partial paragraph, delete the following sentence and citations:

> "If no such additional evidence suggesting current dangerousness is found during the review of the record, petitioner shall be granted parole immediately, subject to the Governor's review. (See Cal. Const., art V, § 8, subd. (b); Pen. Code § 3041.2; *Prather*, at p. 251.)"

Replace the deleted portion with the following:

> If no such additional evidence suggesting current dangerousness is found during the review of the record, petitioner shall be granted parole immediately.

1

The petition for rehearing is denied.

There is no change in judgment.

Dated: _____                    _____

Kline, P.J.

*In re Perez on Habeas Corpus* (A145279, A148392)

2

Trial Court:                                 Solano County Superior Court

Trial Judge:                                 Hon. David Edwin Power


Attorneys for Petitioner:                    Michael Satris
                                             Law Office of Michael Satris
                                             By Appointment of the Court of Appeal
                                             Under the First District Appellate Project


Attorneys for Respondent:                    Office of the Attorney General

                                             Kamala D. Harris
                                             Attorney General of California

                                             Jennifer A. Neill
                                             Senior Assistant Attorney General

                                             Sara J. Romano
                                             Supervising Deputy Attorney General

                                             Amanda J. Murray
                                             Deputy Attorney General

Filed 12/29/16 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DAVID PEREZ<br><br>    on Habeas Corpus. | A145279 & A148392<br><br>(Solano County Super. Ct.<br> No. FCR313210) |

Petitioner David Perez is a state prison inmate convicted of kidnapping during the commission of a carjacking and kidnapping to commit robbery, committed when he was 16 years old. He was sentenced to seven years to life in prison in 1999. He has petitioned for writs of habeas corpus, following the October 2014 and April 2016 decisions of the Board of Parole Hearings (the Board) denying him parole.[1] He contends the Board's decision at the 2014 hearing, based on his purported lack of insight into his criminal conduct and his disciplinary history in prison, was arbitrary, in violation of due process, because it was unsupported by some evidence of his current dangerousness. He also contends the Board's failure to set a base term and an adjusted base term for him in accordance with the stipulated order in *In re Butler* (A139411) issued by this court on December 16, 2013, constituted a denial of both his right to due process and his right to be free from cruel and unusual punishment. Petitioner likewise challenges the Board's subsequent decision at the 2016 hearing to deny parole based on his failure to take responsibility for the life crime.

---

[1] On November 2, 2016, we consolidated petitioner's two habeas petitions in this matter.

4

As we shall explain, because the evidence relied on by the Board at both the 2014 and 2016 hearings is not rationally indicative of current dangerousness, its decisions violate due process. We shall therefore grant the consolidated petitions and remand the matter to the Board for further proceedings as set forth in this opinion. (See *In re Prather* (2010) 50 Cal.4th 238, 244 (*Prather*).) However, because the Board recently set a base term and adjusted base term, we conclude petitioner's claim challenging the Board's failure to do so is moot.

## BACKGROUND

In 1999, a jury found petitioner guilty of kidnapping during the commission of a carjacking (Pen. Code, § 209.5, subd. (a)),[2] and kidnapping to commit robbery (§ 209, subd. (b)), and found true the accompanying allegations that a principal in each offense was armed with a firearm. At the time the offenses took place, in 1997, petitioner was 16 years old. Petitioner was sentenced to a term of seven years to life in prison on the kidnapping during the commission of a carjacking count and a one-year consecutive term on the accompanying firearm enhancement.[3] He became eligible for parole on April 29, 2005, and is currently serving his 18th year in state prison.

Following prior denials of release on parole, in 2014, the Board again denied petitioner parole and scheduled his next parole hearing to take place in three years.

On June 2, 2015, petitioner filed a habeas petition challenging the Board's denial of parole and its failure to set base and adjusted base terms. On September 9, 2015, we issued an order to show cause to the Department of Corrections and Rehabilitation, returnable before this court. Thereafter, petitioner filed a supplemental petition, real party in interest (respondent) filed a return, and petitioner filed a traverse.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] The trial court imposed a concurrent sentence on the kidnapping for robbery count and stayed the accompanying firearm allegation. On appeal, a panel of this Division found that the kidnapping to commit robbery count should also have been stayed under section 654 and modified the judgment accordingly. (See *People v. Perez* (2000) 84 Cal.App.4th 856, 862.)

5

Subsequently, on April 15, 2016, the Board again denied petitioner's parole request. On May 23, 2016, petitioner filed a second habeas petition, challenging the Board's 2016 denial of parole, directly with this court. On November 2, 2016, we issued an order to show cause to the Department of Corrections and Rehabilitation, returnable before this court, and consolidated the two cases. Respondent then filed a return to the second petition and petitioner filed a traverse.[4]

---

[4] Citing *In re Roberts* (2005) 36 Cal.4th 575, 593, respondent asserts that because petitioner did not file a habeas petition in the trial court before filing his 2016 petition in this court, we should remand the 2016 matter to the trial court to initially resolve his claims. A panel of this court rejected a similar claim in *In re Kler* (2010) 188 Cal.App.4th 1399, 1404 (*Kler*), in which we found it appropriate to directly review a challenge to a denial of parole that followed the reversal of a prior denial. We explained: "This case presents an 'extraordinary' situation justifying the exercise of our constitutional prerogative. . . . [H]ere, the issues presented directly flow from our prior decision and the limited hearing conducted after our decision. As such, no court is better suited to first consider this petition; no court is more familiar with the intricate details of the case. Thus, we find this to be one of the rare cases where the directive that 'a habeas corpus petition challenging a decision of the parole board should be filed in the superior court ([*In re*] *Roberts*, . . . at p. 593) does not apply.' " (Accord, *In re Scott* (2005) 133 Cal.App.4th 573, 578.)

Although, in this case, unlike in *Kler*, the issues raised in the new petition do not relate to a prior decision of this court, the same rationale applies since those issues do flow directly from the now consolidated habeas petition filed in this court following both the 2014 parole denial and the trial court's subsequent denial of petitioner's habeas petitions filed in that court. We therefore will exercise our original habeas jurisdiction and address the merits of the petition from the 2016 parole denial. (See *Kler*, *supra*, 188 Cal.App.4th at p. 1404; accord, *In re Cerny* (2009) 178 Cal.App.4th 1303, 1305, fn. 1 [Division Three of this District considered a habeas petition challenging a 2008 denial of parole that was filed in appellate court in first instance, where earlier habeas petition challenging 2007 denial of parole was pending oral argument].)

We also decline respondent's invitation in its return to the 2016 petition—in a one-sentence statement containing no legal argument—to find that because petitioner participated in a new parole hearing in 2016, his claims related to the 2014 denial are moot. (See *In re Cerny*, *supra*, 178 Cal.App.4th at p. 1305, fn. 1 [consolidating two habeas petitions challenging 2007 and 2008 parole denial decisions, where petitions were not identical, but "raise[d] key issues with significant overlap"].) As petitioner puts in his traverse, the April 2016 parole denial "simply exacerbated and enlarged upon the

On October 20, 2016, the Board set a base term and an adjusted base term of 10 years for petitioner's life crime.

### The Commitment Offense and Petitioner's Prior Juvenile Record

According to a 1999 probation report, about 7:30 p.m. on August 12, 1997, three individuals, one of whom was later identified as petitioner, were inside a white car in a Costco parking lot in Fairfield, five or six spaces away from a Mercedes Benz automobile. As the victim, the owner of the Mercedes Benz, pushed a shopping cart full of groceries from the store toward his car, two of the individuals, including petitioner, walked toward him. The second assailant pulled out a shotgun, pointed it at the victim, and said, " 'I'm taking you and your car. Get inside.' " The victim said, " 'No, take the car,' " to which petitioner responded, " 'No, I'm taking you too.' "

The victim offered his wallet to the suspects; the second assailant took the wallet and pushed the victim into the rear of the car. Petitioner then got into the driver's seat and the second assailant got into the front passenger seat and pointed the gun at the victim. The third individual remained in the white car and followed the victim's car as petitioner drove it out of the parking lot. The second assailant looked through the victim's wallet and, when he realized there was no money inside, he yelled at the victim. Petitioner said that they were going to "get" him and that "[w]e'll take him out to some quiet place." The second assailant, however, said they were going to drop him off at the corner. The victim then gave the second assailant his watch.

The victim could smell alcohol on the breath of both assailants and he believed they were intoxicated. He thought they were going to kill him because petitioner "kept saying they were going to take him some place quiet and 'take care of' him." When petitioner slowed for a stop sign, the victim jumped out of the car and was able to get away. Later that night, the police received a call from a citizen who had observed three

---

arbitrariness of the Board's denial of parole to him in 2014 because he has been entitled to a grant of parole since at least 2014 and yet the Board repeatedly has refused to grant parole on increasingly arbitrary bases."

individuals wiping down the victim's car with rags and towels. They then got into a white car and drove away.

Latent prints subsequently recovered from outside of the driver's window of the victim's car were determined to be petitioner's. The police technician who recovered the prints stated that the prints were "pointed downward from the top of the window [and] that it appeared that whoever made the prints, grabbed the outside of the top of the driver's window from inside the car, while the window was partially rolled down." The victim also positively identified petitioner as the driver of his vehicle.

The probation report reflects that petitioner had a prior juvenile record. He was initially placed on informal probation in 1994, for two counts of theft. Probation was subsequently revoked after petitioner was twice arrested for battery. He was made a ward of the court in 1995 based on sustained counts of petty theft and battery. He was then arrested in 1996 for vandalism, and was arrested six more times during the court proceedings. After he admitted one count of vandalism and one count of felony residential burglary, he was continued as a ward. Two days after that disposition, a new petition was filed because petitioner violated a no contact order and had gang paraphernalia in his possession. He was then committed to a boy's ranch for 90 days. He committed the present offenses prior to completion of a 90-day furlough from the ranch.

The use of drugs and alcohol was not seen as a major factor in petitioner's background, although at least two of his arrests had involved possession of alcohol. Petitioner's probation had "included full gang orders. However, they did not appear to have been included because of his membership or association with an established gang, but due to his association with a group called the 'Ridgeview Players.' There was concern that this particular group would develop into an organized gang."

### Petitioner's 2014 Psychological Evaluation

In petitioner's most recent psychological evaluation, prepared by Forensic Psychologist Kimberly Smith in May 2014, Dr. Smith reported that petitioner had described his childhood as "happy." His parents divorced when he was six years old and

8

his father obtained custody two years later because his mother " 'was not very stable.' " He stated that he rebelled against his father and acknowledged a history of antisocial behavior beginning at age 12, which included stealing, vandalism, breaking into houses, fights, and running away from home.

Dr. Smith noted that, despite petitioner's occasional use of alcohol and marijuana between the ages of 13 and 14, "there was nothing in his record to suggest he had a problem with substances." Dr. Smith found that petitioner met the criteria for antisocial personality disorder based on the fact that he "has failed to conform to social norms as evidenced by his criminal history and institutional disciplinary infractions. He has demonstrated a reckless disregard for the safety of others as evident in his life crime. Further, he has demonstrated a lack of remorse for his behavior and has been irresponsible."

With respect to petitioner's institutional adjustment and programming, Dr. Smith noted that his current classification score was 19 and he was assigned to fiber optics. He had earned his certification as a network cabling specialist and had completed three tiers of related training. He had also participated in numerous self-help groups while incarcerated. Since his last parole hearing in 2011, he had participated in, inter alia, "In-Building Self Help Program Associations as well as Criminal and Addictive Thinking Short-Term, CA New Start Transition Program, Employment Readiness Program, Victim's Awareness, Conflict Management, KATARGEO Going Home and Substance Abuse Program."

Dr. Smith reported that petitioner had "demonstrated some problems with abiding by the rules and regulations of the institution" in that he had been issued a total of six "CDC-115's," including two for violent behavior: participation in a riot in 2000 and battery on a peace officer in 2003.[5] His most recent CDC-115 was issued in 2012 for

---

[5] A "CDC-115" is a rules violation report issued when "misconduct is believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd.

9

excessive physical contact.  He had also been issued a "CDC-128A" in 2007 for disobeying "C status procedures."[6]

Regarding petitioner's parole plans, he had already been accepted into one transitional program, and hoped to be accepted into two others; he had two job offers; and he "described a significant positive support system in the community."  Dr. Smith opined that, "[o]verall, [petitioner's] parole plans are reasonable provided he is able to secure placement in a transitional program and his plans are verified."

In assessing petitioner's risk for violence, Dr. Smith believed that historic factors indicated "pervasive antisociality characterized by early behavioral problems, juvenile delinquency, problems with abiding by conditional release, commission of varied criminal offenses, manipulative behavior, lack of remorse and failure to accept responsibility for his own actions."  In her analysis of clinical factors, Dr. Smith stated that petitioner "demonstrated one factor in the clinical domain that is associated with an increased risk for violence.  He has a lack of insight with regard to his personality, behavior and criminal past.  He chose not to speak about the crime. . . .  He said '[he was] very sorry for what happened to [the victim] with that crime.'  It should be noted that [petitioner] has not discussed the crime in previous evaluations as well.  He maintains his innocence and has yet to discuss or accept responsibility for the crime.  Given he has not

_____

(a)(3).)  (All further regulatory references are to title 15 of the California Code of Regulations unless otherwise indicated.)

Exhibits submitted with the return reflect petitioner's receipt of the following additional CDC-115s:  in 2006, petitioner had engaged in attempted overfamiliarity when he touched a corrections officer on the back; in 2008, he pleaded guilty to conspiracy to introduce/distribute tobacco; and in 2012, he was found to have engaged in excessive physical contact when, during a visit, he kissed the hand of his fiancée, touched her face, and rubbed her right waist area.  The 2012 incident was his last rules violation before the 2014 hearing.

[6] A "CDC-128A" is a "Custodial Counseling Chrono" issued when "minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed.  (Regs., § 3312, subd. (a)(2).)

10

accepted responsibility for his crime and declined to discuss anything related to the crime he has yet to express any credible remorse for his behavior."

Dr. Smith further stated that petitioner had indicated "that his criminal behavior all stems from his rebellion against his father," which began after his father separated from his fiancée and petitioner's "stepbrothers," with whom he was close. Dr. Smith believed that, "[w]hile this is a start to understanding his past criminal behavior, [petitioner] needs to examine his behavior further and develop a deeper understanding of his past criminal behavior." She also found, however, that petitioner had not expressed "any recent problems with violent thoughts or intent or any emotional or behavioral instability. He does not have a mental disorder that would predispose him to the commission of violence. He has abided by the rules and regulations of the institution since his last CDC-115 in 2012."

Regarding the risk of future violence, Dr. Smith opined that petitioner "continues to present with risk factors which suggest a moderate level of risk. Notably, he continues to accrue CDC-115's since his last hearing date. This willingness to break rules may impact his ability to follow parole rules in the community. He has yet to accept responsibility for the crime or develop an understanding with regard to the causative factors to the crime." Petitioner's understanding and exploration of his criminal behavior in general was also limited and he was therefore unable to develop adequate risk management strategies to avoid such behavior in the future. Dr. Smith concluded, inter alia, that petitioner "can mitigate his risk by taking full responsibility for the offense [and] developing an understanding of his motives for the life crime and additional criminal behavior . . . ."[7]

---

[7] In the 2014 psychological evaluation, Dr. Smith briefly described several earlier evaluations, including one in 2004, in which a psychologist opined that petitioner met criteria for antisocial personality disorder and presented an average level of dangerousness within the prison environment; another evaluation in 2006, in which a psychologist opined that petitioner's adult behavior did not support a diagnosis of antisocial personality disorder and that he presented a low to moderate risk for violence

11

### The 2014 Parole Hearing and Decision

Petitioner was 33 years old at the time of the October 14, 2014 parole hearing.[8] Petitioner described his childhood, explaining that he had initially lived with his mother, who gave birth to him at age 16. Due to her irresponsibility, his father obtained custody of petitioner, his sister, and his brother, and they lived with his father, his uncle and aunt and their three children, and his grandfather. After his mother left, petitioner's father was engaged to a woman for four years. Petitioner considered her his stepmother and her children his stepbrothers and stepsisters. She and his father broke up when he was 11 or 12 and, "overnight I lost touch with my brothers and my sisters, my stepmother." He then began rebelling against his father. As he described it, "my family is loving, but I created chaos." When asked why he rebelled against his father, petitioner explained, "I didn't recognize at that time that I was blaming him for feeling like I was abandoned, that my mother was young and having fun. Every time she came to pick me up, we were having fun together. And my dad was a single parent trying to . . . set boundaries for me . . . . I was influenced by the kids up the street, and I wanted to be like them." Ages 13 to 14 "were some tough years for me" because "I didn't know who I was. And in the midst of trying to find myself, I found all the most negative things I can get into."

In addition, petitioner acknowledged for the first time at the hearing that he had been molested twice by his sister's boyfriend when he was young, the impact of which he had only recognized in the previous three years. He realized that he "was insecure because of what happened. And it—in my attempts to gain some kind of security, you know, and I created a ego that—then I justified a lot of decisions making." He further

---

in the community; and the most recent evaluation in 2010, in which the psychologist indicated that petitioner met criteria for alcohol abuse and nicotine related disorder, as well as antisocial personality disorder, and that he was a moderate risk for violence in the community. Those evaluations are not included in the habeas record.

[8] Although the record indicates that petitioner had previously applied for and been denied parole, the relevant hearing transcripts are not included in the exhibits submitted in support of the habeas petition.

explained why he started fighting at age 12, which led to arrests for battery: "I was trying to re-enforce [*sic*] this ideal I had of myself of being a tough kid. [¶] Because I needed a ego to gravitate towards other than the insecure person that I felt like I was."

When asked why, given that he was good at school and sports, he chose "the wrong path," petitioner stated that he was angry and did not understand why: "The things I placed value in weren't the things I had. And the male role models in my family, I saw, you know, a single parent working at a restaurant. I saw that as a failure." When asked again why he took the criminal path, petitioner said it was a combination of factors, including "me not being able to express the emotions of abandonment with my mother and stepmother. . . . And I think that the impact that that had on me, leaving that . . . situation, coming back to Fairfield and then my first role model. I think I picked the worst role model. I picked the tough—you know, I picked a terrible guy to be a role model."

Petitioner then affirmed that he had always maintained that he was not involved in the life crime in 1997. The commissioner stated the Board's understanding that petitioner was not required to admit the circumstances of the life crime, but asked about what kind of person he was in 1997. Petitioner stated that he "was exactly the kind of person that committed all those crimes before 1997. I was still trying to be that macho-ass kid." After returning from the boys' ranch, he quickly found himself back in trouble and knew that his "behavior was escalating fast." He was "still at this time the type of kid who would have committed this crime, no problem. . . . [G]iven the opportunity to do this, this is the kind of thing I would have did." Petitioner then stated that he was "a very thankful person today" because of what had been provided to him since he had been arrested. He explained, "When I created victims, I didn't ask them for their rights. I didn't offer that to them. I didn't think about, you know, what they deserved." He noted that he was two classes away from an "AA degree," had learned vocational trades, and had "a different kind of maturity now," stating that he was "hell of ashamed." And, even though it was frustrating to be convicted for something he had not done, "[i]f I didn't

13

come to prison for this, I could have very easily been coming to prison for something more serious than this." He was thankful to have been taken off the streets "because I think it saved my life and it just as very well could have saved other people's lives."

Petitioner explained how he had changed since he was younger, when "my only self-worth valued from how other people saw me. I wanted to be a criminal." His values had completely changed since then; now, "[i]nstead of seeing my father as being a failure, he's my rock, and I value family. I value hard work. I value struggles [that] shape you and make you who you are. . . . I value people's rights and their freedoms from being injured, all right, from the violence and stuff that crime perpetuates out there. Life is precious. . . . I value the struggle that it's been to go home . . . because I've learned something every step of the way. . . ."

Also discussed at the hearing were the various types of vocational training petitioner had received in prison, his college education, and his years working as a literacy tutor with other inmates. One of the commissioners also noted that petitioner had a great deal of family and community support and that his plans for parole looked good.

Regarding his disciplinary history in prison, the commissioners expressed concern that petitioner had engaged in excessive physical contact with his fiancée in 2012, since his last parole hearing in 2011. One of the commissioners asked, "If you can't follow the rules while you're in the prison, why do you think we should trust you if we get you out of here?" Petitioner responded, "I recognize in the past maybe I had made a habit . . . of asking myself when I made decisions, am I hurting somebody or is this wrong or right instead of asking is it against the rules, simple. . . . And since then, it's been reinforced to me more than once that that's not how—you know, that's, of course, the right way. That's the pro-social way to make decisions now. You know, on the top of your decision tree, let it be is it against the rules and regulations and not just are you hurting somebody from doing this. And I'm sorry. . . ." He further explained that he thought that a mistake he had made was "rationalizing certain behavior."

14

At the conclusion of the hearing, the presiding commissioner acknowledged that the Board must give great weight to the diminished culpability of juveniles, but stated that the panel had nonetheless determined that petitioner still posed an unreasonable risk of danger to society or a threat to public safety, and therefore found him not suitable for parole. With respect to petitioner's insight, the commissioner stated, "In our discussions today, your statements were very, very general. You were very general about your causative factors and . . . were very—I don't want to say the word clinical, but you were almost to that point where you have . . . this understanding in a—in an educational sense of, you know, you said, 'I was an insecure person and I needed to compensate by, you know, being involved with negative influences. I gravitated towards negative influences.' So it was very general, and we kept coming back to the specifics of why. And we understand that at 16 you may not have understood it, but at 33, we need to make sure you understand it so that when you're back in the community, you're not going to be that person who is gravitating towards the negative influence who is feeling the insecurity and the need to compensate by going towards negative influences. Because quite frankly you hadn't addressed yet to this Panel to our satisfaction of why you did what you did, why you want to be a criminal, what was the attraction to the criminal lifestyle. . . . [Y]ou kept saying, 'I had negativeness [*sic*] in my decisions in the past,' and it's all still very general. And you've been doing all of these self-help programs, so that's why we kept delving into why, the why, why, why."

The presiding commissioner then discussed petitioner's rules violations in prison, stating that "what caused this Panel a lot of trouble, is what is preventing you from following the rules. You go a few years and you make great decisions, and then you make bad decisions." The commissioner stated that these bad decisions coupled with petitioner's inability to explain "the causative factors" of his behavior made him a threat to public safety. He noted that these concerns were echoed as well in the recent risk assessment, in which the psychologist noted that "you have exhibited poor judgment, you have an underdeveloped sense of responsibility, a lack of appreciation for the

15

consequences of your behaviors, inability to comply with rules and regulations, which was evident during your adolescence and at the time of the commitment of the crime."

The presiding commissioner further stated that because petitioner was a youth offender, no base term calculation was required. The Board then issued a three-year parole denial.

### *Habeas Corpus Proceedings in the Trial Court*

Following the Board's October 2014 denial, petitioner filed a habeas petition in the trial court challenging the Board's decision finding him unsuitable for parole, and also contending the Board did not fix his prison term as required by the stipulated order in *In re Butler*, issued by this court in December 2013, based on his being a juvenile offender. The court denied the habeas petition after finding that there was some evidence in the record to support the Board's conclusion that petitioner presented "a current and unreasonable danger to the public."

In particular, the court found the evidence showed that petitioner "lack[ed] insight into the causative factors of his criminal behavior," which was indicative of current dangerousness; that he continued to break prison rules, "willfully engag[ing] in misconduct [and] exhibiting criminal thinking, despite knowing the rules," and that the 2014 psychological evaluation indicated that he presented "a moderate risk of violence in the community," with the psychologist explaining "that she reached this conclusion based on various factors beyond [p]etitioner's denial of responsibility for his life offense. [Citation.]" Finally, as to petitioner's claim that the Board did not fix his term as required by the stipulated order in *In re Butler* because he was a youthful offender, the court found that he had "fail[ed] to show that he [had] exhausted administrative remedies or that administrative remedies [were] unavailable to him. [Citation.]"

16

### *The 2016 Parole Hearing and Decision*

Petitioner was 35 years old at the time of the April 15, 2016 parole hearing, which took place 18 months after the prior hearing.[9] At the start of the hearing, the presiding commissioner asked petitioner's counsel whether petitioner would be speaking to the panel, and counsel responded, "No, he will be exercising his right [under regulatory and case law] not to testify to the underlying facts of the controlling offense or the crimes involved." Then, when asked if petitioner would be talking about self-help programs, counsel responded in the affirmative. Despite counsel's statement that petitioner would not be talking about the life crime, the deputy commissioner's first questions to petitioner related specifically to his trial, including who testified, what that testimony was, and how long the jury deliberated before convicting him. When the commissioner asked why the victim "would lie that it was you," petitioner said, "I don't believe he lied as much as, over the course of two years, he changed his first statement, which was that he could not identify the Hispanic individual, only the black one, and then proceeded to misidentify four black individuals, leaving my fingerprints on the outside of the car." The commissioner then said, "I'm only interested—he identified you. I'm not interested in your extrapolation about his identification or non-identification really."

After the presiding commissioner asked counsel to let the panel know if it crossed the line in terms of "getting into discussing the life crime," the deputy commissioner stated that it was "certainly within the authority of the Board to ask you questions that relate to what people stated [at trial], right?" Petitioner said, "I'll defer to you." The deputy commissioner then asked, "At the time, why did you not identify the driver of the vehicle?" When counsel objected, the commissioner responded that the question related

---

[9] Although petitioner's next hearing was set for three years after the 2014 denial, the commissioners observed that, at petitioner's request and because he had taken numerous self-help courses and remained disciplinary-free since the 2014 hearing, the Board had advanced the hearing. The commissioners also stated that they were still relying on the same 2014 psychological evaluation by Dr. Smith that the panel at the 2014 hearing had considered.

to testimony petitioner gave at the prior hearing, when he identified the perpetrator who had driven the victim's vehicle. The commissioner again asked petitioner why he had not identified the driver earlier, and petitioner said it was because he was "selfish and naïve." When the commissioner said that it had "nothing to do with selfishness," but instead with "criminal thinking," petitioner explained, "My criminal thinking told me not to participate or cooperate with the police, right. But away from that thinking, I felt selfishness was appropriate because I was not concerned with [the victim.] I was only concerned with the repercussions and what they would be against me, and I feel like that's very selfish today, right. He deserved the justice that he deserved. It took—so I should have cooperated. I definitely should have. I wish I did." When the commissioner expressed disbelief that petitioner would put himself in the position of perhaps being convicted of the life crime due to his refusal to identify the real perpetrator, petitioner explained, "It was like, it's not my job to cooperate, I didn't do it, and it will be proven through the courts. And that was naïve and selfish of me . . . ."

When the deputy commissioner asked petitioner when he first mentioned the name of the vehicle's driver, petitioner said he had told his attorney before trial, at which point his counsel at the parole hearing stated that those discussions were protected by the attorney-client privilege. The commissioner responded that petitioner could waive that privilege if he chose to do so, and petitioner said he was willing to waive the privilege. Petitioner then explained that he had told his attorney the driver's name and his attorney had met with the driver. After he was found guilty, petitioner had made a *Marsden* motion,[10] at which time he told the court that he had provided his attorney with the name of the driver. Petitioner then "apologize[d]" to the commissioners "for who I was then. I've tried to demonstrate since then, you know, that I'm not 16 anymore, that I'm not impulsive, and that that's not who I want to be. And when I reflect on for two years

_____

[10] *People v. Marsden* (1970) 2 Cal.3d 118.

18

[before trial] consistently having the opportunity to cooperate with the authorities and not doing it, it's one of the biggest regrets of my life."

The commissioners then turned to petitioner's postconviction circumstances. With respect to his educational accomplishments, he confirmed that he had received a certificate for taking all of the community college business classes that were offered and that he had enough units to qualify for an associate of arts degree, but still needed some English and math credits. Petitioner also testified that he was in the process of completing a vocational carpentry program that he had begun in September 2015. The commissioners read a laudatory chrono from petitioner's instructor, which described his "[g]ood work ethic, positive attitude, and . . . relevant ideas how to go about rebuilding impoverished neighborhoods and entrepreneurship." The commissioners observed that petitioner had completed programs in fiber optic and copper network based cabling, refrigerant usage, kitchen baking, and had also received his license for heating, ventilation, and air conditioning.

The commissioners also discussed the numerous self-help programs in which petitioner had participated, and petitioner said that, through some of these programs, he had reflected on the harm he had done to his community when he committed crimes in his youth and failed to cooperate with the authorities in the life crime, which "helped me to understand the magnitude of my negative decisions." Petitioner also mentioned the importance of a group he was currently facilitating called Man Up, through which he was helping "other young men not make the same decisions, to re-establish what manhood consists of and what our responsibilities are as men, as people trying to exit the criminal justice system into our own communities."

Finally, the commissioners discussed petitioner's disciplinary history, noting that he had had no issues with discipline since April 2012, when he received a CDC-115 for excessive physical contact with his then fiancée (now wife) during a visit. The commissioners noted he had received a laudatory chrono shortly before the present hearing from a visit supervisor, who stated that both petitioner and his wife were "polite

19

and pleasant to work with." He had also received a laudatory chrono from another visit supervisor, who stated that petitioner "always presented as bright, maintain [*sic*] your bearing, courteous, and patient, which is a rare and good thing." The supervisor opined that petitioner would be successful if released on parole.

At the end of his closing statement, petitioner asked "to be given a chance to not just go home and start my life, but let me pay forward some of what was given to me. . . . I have a lot of amends to make. And I hope to—it doesn't start when I go home. Like I've [taken] that responsibility on myself today to do it in the community I'm currently [in], and I hope to continue that into the future."

At the conclusion of the hearing, the panel found that petitioner "poses an unreasonable risk of danger or a threat to public safety, and is therefore not eligible for parole." The presiding commissioner stated that the panel had considered the fact that petitioner was a juvenile when he committed the life crime and also noted that "he has engaged in institutional activities that indicate that he has the ability to follow the law, and he has not had any major rule violations for some time." The panel found, however, that those factors were "far outweighed" by other factors: "Specifically, we find that the life crime is still relevant here today."

The presiding commissioner explained that petitioner had asserted that he was innocent even though he was tied to the crime by latent prints and the victim's positive identification of him as the driver. "So the life crime has never been reconciled by [petitioner]." He then said the Board respected petitioner's right to claim his innocence, but that "this Panel finds that your explanation for the life crime is implausible and find that it by evidence [*sic*] of an implausible denial due to the ongoing evidence in this case. . . . He's never—he just says he's innocent. He's never talked about anything where it shed light on this. And that's his right. The court also said that they support us when we have [*sic*] no insight. We have no responsibility, we have no level of insight, and how can you have remorse when you don't have insight?" The presiding commissioner continued, "An inmate who refuses to interact with the Board at a parole hearing deprives

20

the Board of a critical means of evaluating the risk to public safety . . . ." The commissioners also relied on Dr. Smith's 2014 evaluation, in which she had found that petitioner needed to "accept responsibility for the crime or develop an understanding with regard to the causative factors to the crime."

In addition, the deputy commissioner stated that he found petitioner's claim that he knew the person who had driven the victim's car during the crime, but had not used that information to attempt to exonerate himself, to be "irrational and it makes no sense, and that bears indicia of implausibility." The commissioner also found it implausible that the victim would have identified petitioner, a young teenager, as the driver when petitioner asserted that the actual driver was older than him. He believed that "when all the facts point to implausibility, then that also then turns to current dangerousness in remaining married to the implausible tale."

The Board then issued another three-year denial of parole.

## DISCUSSION

### I. *The Board's 2014 and 2016 Denials of Parole*

Section 3041, subdivision (a)(2) provides that one year before an inmate's minimum eligible parole date, a panel of commissioners shall meet with the inmate and shall "normally" grant parole. Subdivision (b)(1) further provides that the Board "shall grant parole to an inmate unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." (§ 3041, subd. (b)(1).) "As a result, parole applicants have a 'due process liberty interest in parole' and ' "an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." ' ([*In re*] *Lawrence* [(2008) 44 Cal.4th 1181], 1191, 1204, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654.)" (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 615 (*Stoneroad*).)

21

"We review the Board's decision under a 'highly deferential "some evidence" standard.' " (*In re Young* (2012) 204 Cal.App.4th 288, 302 (*Young*), quoting *In re Shaputis* (2011) 53 Cal.4th 192, 221 (*Shaputis II*).)  "[T]he appellate court must uphold the decision of the Board or the Governor 'unless it is arbitrary or procedurally flawed,' and it 'reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.' ([*Shaputis II, supra,* 53 Cal.4th] at p. 221.)  'The reviewing court does not ask whether the inmate is currently dangerous.  That question is reserved for the executive branch.  Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness.  The court is not empowered to reweigh the evidence.' (*Ibid*.)  At the same time . . . the Board's decision must ' "reflect[ ] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." ' (*Shaputis II,* at p. 210, quoting [*In re*] *Rosenkrantz, supra,* 29 Cal.4th at p. 677, and citing *Lawrence, supra,* 44 Cal.4th at p. 1204, and [*In re Shaputis* (2008)] 44 Cal.4th [1241,] 1260–1261 [(*Shaputis I*)].)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 616.)  We are required to affirm a denial of parole "unless the Board decision does not reflect due consideration of all relevant statutory and regulatory factors or is not supported by a modicum of evidence in the record rationally indicative of current dangerousness, not mere guesswork." (*Ibid*.)

The nexus to current dangerousness is critical.  "*Lawrence* and *Shaputis I* 'clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' (*Prather,* [*supra,* 50 Cal.4th] at pp. 251–252.)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 615.)  " 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public.' (*Lawrence, supra,* 44 Cal.4th at p. 1212, italics added.)

The Board 'must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record.' (*Prather*, . . . at p. 255, italics added.)" (*Young, supra,* 204 Cal.App.4th at p. 303.) " '[T]he proper articulation of the standard of review is whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence,* . . . at p. 1191.)' ([*Prather*], at pp. 251–252.)" (*Shaputis II, supra,* 53 Cal.4th at p. 209.)[11]

## A. *The Board's Denial of Parole in 2014*

The Board gave two reasons for its decision in October 2014: petitioner was unable to explain "the causative factors" of his youthful criminal behavior and he had continued to commit rules violations while in prison.

---

[11] The Board's regulations set forth six circumstances tending to show unsuitability for parole and nine tending to show suitability, leaving the importance of these circumstances in a particular case to the judgment of the panel. (Regs., § 2402.) The circumstances tending to show unsuitability are (1) that the commitment offense was carried out "in an especially heinous, atrocious or cruel manner," (2) that the prisoner on previous occasions inflicted or attempted to inflict serious injury, especially if he or she "demonstrated serious assaultive behavior at an early age," (3) that "[t]he prisoner has a history of unstable or tumultuous relationships with others," (4) that the prisoner has previously committed sadistic sexual offenses, (5) that "[t]he prisoner has a lengthy history of severe mental problems related to the offense," and (6) that "[t]he prisoner has engaged in serious misconduct in prison or jail." (Regs., § 2402, subd. (c).) The circumstances tending to show suitability are (1) that the prisoner does not have a juvenile record of assaults or crimes with a potential of personal harm to victims, (2) that the prisoner "has experienced reasonably stable relationships with others," (3) that the prisoner has performed acts tending to indicate remorse or indicating he "understands the nature and magnitude of the offense," (4) that the prisoner committed the crime as a result of significant stress in his life, particularly stress built over a long period of time, (5) that the prisoner suffered from battered women's syndrome, (6) that the prisoner "lacks any significant history of violent crime," (7) that the prisoner's "present age reduces the probability of recidivism," (8) that the prisoner has made realistic plans for release or developed marketable skills that can be put to use upon release, and (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d).)

23

First, the Board's concern that petitioner was unable to explain why he engaged in criminal conduct relates to its belief that petitioner lacked "insight." (See *Shaputis II*, *supra*, 53 Cal.4th at p 218.) As the Supreme Court made clear in *Shaputis II,* "[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' (Regs., § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense.' (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.' " (*Shaputis II,* at p. 218.) "[T]he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. (*Lawrence,* [*supra,* 44 Cal.4th] at p. 1227; see also *Shaputis I,* [*supra,* 44 Cal.4th] at p. 1261, fn. 20.)" (*Shaputis II,* at p. 218.) Still, "the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (*In re Ryner* (2011) 196 Cal.App.4th 533, 548-549.) It has been noted that an inmate's lack of insight has taken the place of the heinous nature of the commitment offense as a standard reason to deny parole, "so much so that it has been dubbed the ' "new talisman" ' for denying parole. [Citation.]" (*Id.* at p. 547.)

In finding petitioner unsuitable for parole, the Board found that his statements "were very, very, general" as to the "causative factors" for his criminality. The presiding commissioner explained that petitioner needed to understand why he had gravitated to negative influences so that he would not again do so if released back into the community. The Board did not believe petitioner had yet addressed this "to our satisfaction of why

24

you did what you did, why you want to be a criminal, what was the attraction of the criminal lifestyle . . . ."

In fact, the hearing record reflects that petitioner addressed in detail his reasons for turning to criminality in his youth. He described what he felt was his mother's abandonment, followed by the sudden departure of his stepmother and stepsiblings. In explaining why he chose the criminal path, petitioner stated that it was due to his inability to express the feelings of abandonment by his mother and stepmother. As he explained, "I started getting in trouble right after my father left my stepmother and my stepbrothers. And I think that's because of what they meant to me. All right? Like I didn't have no identity before them. I didn't know how to comb my hair. I didn't have a sibling I can really interact with like I could [with the stepbrothers]. And their mother was a jewel, like one of the strongest women I've ever met."

In responding to a question regarding why he turned away from school and sports, at which he excelled, petitioner explained that, after losing his stepfamily at age 12, he was angry and did not understand why. He also did not realize at the time that he was blaming his father for these abandonments, and he began to rebel against his father's attempts to set boundaries. He then "picked a terrible guy to be a role model." He explained that "the male role models in my family, I saw, you know, a single parent working at a restaurant. I saw that as a failure." As he described it, "my family is loving, but I created chaos." Petitioner did not know who he was and, "in the midst of trying to find myself, I found all the most negative things I can get into." He began getting in fights at age 12, and by the time he was 13, he came under the influence of kids who lived near him, who he wanted to be like.

Petitioner also acknowledged to the Board that he had been molested twice at a young age by his sister's boyfriend, and had only recognized the impact of the molestation in the previous three years. He realized that this had added to his insecurity and, in his "attempts to gain some kind of security," he created an "ego" that justified many of the decisions he made and reinforced the "ideal" he had of himself "as being a

25

tough kid," rather "than the insecure person" he felt like he was.  He therefore began to value "[g]etting in trouble, chasing the girls, look at the attention I'm getting.  I'm ashamed.  And I'm ashamed that I tried to exude what that lifestyle was about because I had the hardest working parent that I've known."

When asked how he had changed since the commitment offense, petitioner responded that in his youth his self worth came "from how other people saw me.  I wanted to be a criminal.  I think the difference now today is with maturity comes a complete different understanding of what you value. . . .  Instead of seeing my father as being a failure, he's my rock, and I value family.  I value hard work.  I value struggles [that] shape you and make you who you are. . . .  I value people's rights and their freedoms from being injured . . . .  I value the struggle that it's been to go home . . . because I've learned something every step of the way. . . ."

In light of these multiple examples of petitioner exploring and explaining the circumstances of his childhood that led to his embracing criminality in his early teens, along with his descriptions of how those circumstances affected his emotions and self-image and his current shame and remorse for embracing that lifestyle, the Board's repeated insistence that he had not explained how he had gravitated to negative influences is baffling, to say the least.  (See *In re Denham* (2012) 211 Cal.App.4th 702, 716 ["A Board's 'mere refusal to accept . . . evidence showing [understanding and remorse] is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous' "].)

Given the insight expressed by petitioner at the hearing, we cannot ignore the implication that the Board was heavily influenced by petitioner's having maintained his innocence with respect to the life crime.  Under section 5011, subdivision (b), the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."  Likewise, the Regulations provide that the Board "shall not require an admission of guilt to any crime for which the prisoner was committed.  A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be

made based on the other information available and the refusal shall not be held against the prisoner." (Regs., § 2236; see also *In re Jackson* (2011) 193 Cal.App.4th 1376, 1388-1391 (*Jackson*) [Board improperly relied on prisoner's refusal to admit guilt in finding him unsuitable for parole]; *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023 [same]; *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110-1112, disapproved on another ground in *Prather*, *supra*, 50 Cal.4th at p. 252 [same].)

This case resembles *Jackson*, *supra*, 193 Cal.App.4th at page 1391, in which the Board stressed to the prisoner that he was not required to admit guilt, but then denied him parole based on its findings that he "lacked insight into the crime, failed to take responsibility for it, and did not have remorse." However, as the Second District Court of Appeal explained, the only evidence supporting these findings was the prisoner's refusal to admit he shot and killed the victim of the crime. (*Ibid.*) "Because the only basis for the Board to conclude [the prisoner] lacked insight, failed to take responsibility, and lacked remorse was his refusal to admit guilt for the commitment offense, the Board indirectly relied on that refusal to deny [him] parole. By doing so, the Board violated section 5011, subdivision (b) and [section 2236 of the Regulations]." (*Ibid.*)

Here, although petitioner denied committing a kidnapping for purposes of carjacking and robbery, he told the Board that in 1997, when the life crime took place, he "was exactly the kind of person that committed all those crimes before 1997. I was still trying to be that macho-ass kid." He described his behavior as "escalating fast" and stated that, "[g]iven the opportunity to do this, this is the kind of thing I would have did." Petitioner further stated that even though it was frustrating to be convicted of something he had not done, "[i]f I didn't come to prison for this, I could have very easily been coming to prison for something more serious than this." He believed that being taken off the streets "saved my life and it just as very well could have saved other people's lives." At the hearing, the commissioners acknowledged that the Board is not permitted to condition an inmate's release on an admission of guilt for the life crime. However, without requiring petitioner to admit guilt, it is difficult to imagine what else petitioner

27

could have said about his motivations and escalating criminality, as well as the growth in his understanding and perspective over the years, to convince the Board that he had insight into his youthful criminality. (See *Jackson*, *supra*, 193 Cal.App.4th at p. 1391.)

The Board also relied on the evaluating psychologist's 2014 assessment, in which Dr. Smith repeatedly mentioned petitioner's refusal to admit guilt, as when she stated that he had demonstrated a "lack of remorse and failure to accept responsibility for his own actions," and that he "has yet to accept responsibility for the crime or develop an understanding with regard to the causative factors to the crime." After concluding that petitioner was at moderate risk for future violence, Dr. Smith concluded that he "can mitigate his risk by taking full responsibility for the offense [and] developing an understanding of his motives for the life crime and additional criminal behavior . . . ." Likewise, in her analysis of clinical factors, Dr. Smith stated that petitioner "demonstrated one factor in the clinical domain that is associated with an increased risk for violence. He has a lack of insight with regard to his personality, behavior and criminal past. He chose not to speak about the crime. . . . He said '[he was] very sorry for what happened to [the victim] with that crime.' It should be noted that [petitioner] has not discussed the crime in previous evaluations as well. He maintains his innocence and has yet to discuss or accept responsibility for the crime. Given he has not accepted responsibility for his crime and declined to discuss anything related to the crime he has yet to express any credible remorse for his behavior."[12]

Given that Dr. Smith's concerns about petitioner's dangerousness, including her conclusion that he was at moderate risk for violence, were largely based on his refusal to "accept responsibility for his crime," the Board's reliance on her flawed assessment in denying petitioner parole, together with its refusal to credit petitioner's detailed

---

[12] Dr. Smith's diagnosis of antisocial personality disorder was likewise tainted by her consideration of petitioner's refusal to admit guilt for the life crime. That diagnosis was based in large part on the fact that he had "demonstrated a lack of remorse for his behavior."

expression of insight, necessarily lead to an inference that "the overriding issue for the panel was the extent to which petitioner's [refusal to admit guilt] obstructed his ability to understand the factors that caused the criminal act." (*Stoneroad*, *supra*, 215 Cal.App.4th at p. 627 [petitioner claimed he was unable to remember committing his offense].) Again, such a focus was prohibited. (See *In re Swanigan* (2015) 240 Cal.App.4th 1, 16, 19 (*Swanigan*) [parole wrongly denied where evaluating psychologist had opined that "if one does not admit committing the crime, one cannot have insight into committing it," and Board improperly relied on inmate's "refusal to admit guilt to conclude he did not have insight or show remorse"]; see also Pen. Code, § 5011, subd. (b); Regs., § 2236; *Jackson*, *supra*, 193 Cal.App.4th at p. 1391.)

A prisoner's unwillingness to accept responsibility for the life crime may well reflect a lack of insight indicative of continuing dangerousness (see *Shaputis II*, *supra*, 53 Cal.4th at pp. 216-217), and the cases suggest that most life prisoners neither assert their right to refuse to discuss the details of their offense nor declare their innocence. But where, as here, the prisoner has consistently and for some time maintained his innocence of the life offense, the party evaluating his suitability for release—be it a psychologist or psychiatrist, a Board panel, or the Governor—must tread more cautiously; above all, the evaluator must assiduously refrain from readjudicating the life offense. (*Swanigan*, *supra*, 240 Cal.App.4th at p. 14.) The evaluator must also be sensitive to the intimidating nature of a request that a life prisoner, particularly one who claims innocence, waive the right to refuse to discuss or admit guilt of the life offense, since the request is likely to be seen as a condition of release from prison; which is what section 5011 and section 2236 of the Board's regulations were designed to prevent.

In the circumstances of this case, the Board's veiled reliance on petitioner's continuing refusal to admit guilt clearly violated its own regulations and cannot be countenanced. Indeed, such an improper use of an inmate's claim of innocence to deny parole could lead to the anomalous result of an inmate who *is* in fact innocent never being released from prison unless he or she is willing to falsely admit to committing the life

29

crime. (See National Registry of Exonerations, Exonerations in 2015 <http://www.law. umich.edu/special/exoneration/Documents/Exonerations_in_2015.pdf> [as of December 29, 2016] [Registry recorded 149 exonerations in 2015, including five in California; exonerated defendants had served, on average, more than 14 years in prison]; cf. *Glossip v. Gross* (2015) 135 S.Ct. 2726, 2756-2757 (dis. opn. of Breyer, J.) ["As of 2002, this Court used the word 'disturbing' to describe the number of instances in which individuals had been sentenced to death but later exonerated"].) The prospect of one wrongly convicted inmate being perpetually denied parole on this basis underlines the importance of the legal rule flouted by the Board and Dr. Smith in this case. (See Pen. Code, § 5011, subd. (b); Regs., § 2236; *Jackson*, *supra*, 193 Cal.App.4th at p. 1391.)

Respondent argues that the Board could properly take into account petitioner's refusal to admit guilt in this case because his profession of innocence is not plausible. (See *Shaputis II*, *supra*, 53 Cal.4th at p. 216 ["an *implausible* denial of guilt may support a finding of current dangerousness"]; *Palermo*, *supra*, 171 Cal.App.4th at p. 1112 [where inmate's version of shooting of victim "was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational," his insistence that killing was unintentional did not support Board's finding that he remained a danger to public safety].) Respondent further asserts that the Board was not required to believe petitioner's explanations and that his "credibility, and therefore the plausibility of his version of events, is for the Board to determine." (See *In re Sanchez* (2012) 209 Cal.App.4th 962, 974.) Respondent's position, however, ignores the fact that the Board never made any determination regarding either the plausibility or the credibility of petitioner's version of events involving the life crime.

Moreover, even *had* the Board questioned the plausibility of petitioner's version of events, his discussion with the Board and other evidence show that his denial of culpability was in fact plausible. After petitioner expressed a willingness to answer questions about evidence implicating him in the life crime, he responded to a commissioner's question about how his fingerprints were found on the outside of the

30

victim's car, explaining that he was in his garage with his father, who was cutting his hair, when some older peers who lived nearby "drove up the street, honked the horn, called me down there, and while speaking to them at their car and touching the outside of that window is how I believe to—my fingerprints were put on the outside of that window." The person who was driving the car asked if petitioner had any "weed," but petitioner thought he was actually "showing off the car." At the commissioners' request, and against the advice of counsel, petitioner gave the name of the person who was driving the car to the Board.

Other evidence, not discussed by the Board, included the fact that the fingerprints recovered from outside of the driver's window and determined to be petitioner's were "pointed downward from the top of the window [so] that it appeared that whoever made the prints, grabbed the outside of the top of the driver's window from inside the car, while the window was partially rolled down." The prosecution's expert witness also testified, however, that "the prints could have been made by someone standing between the driver's door and the driver's seat with the door open." This testimony was consistent with petitioner's explanation of his fingerprints on the outside of the window.

In addition, although the victim ultimately identified petitioner as the driver of his carjacked vehicle, he was initially unable to describe the driver, other than to say he was Hispanic and approximately five feet seven to five feet eight inches tall. Nor could he help to construct a "composite" of the driver, stating each time that "he could not recognize" that individual. His tentative identification of petitioner as the driver came 10 days after the crime in a photo lineup. It is " 'no news that eyewitness identification in criminal cases is a problem; it is an old and famous problem. . . .' " (*Swanigan*, *supra*, 240 Cal.App.4th at p. 19 ["Eyewitness identification, particularly of a stranger, is fraught with potential for mistake"].)

Thus, even had the Board based its denial of parole on the implausibility of petitioner's claim of innocence, while there plainly was substantial evidence to support the trier of fact's findings of guilt, petitioner's claim was not in fact *implausible*. (See

31

*Jackson*, *supra*, 193 Cal.App.4th at pp. 1389-1390; see also *Swanigan*, *supra*, 240 Cal.App.4th at p. 19.) In addition, the Board's request that petitioner discuss the evidence and circumstances related to the life crime implicates section 2236 of the regulations, which provides, inter alia, that "[a] prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner." Although this regulation explicitly permits a prisoner to refuse to discuss any circumstances related to the life crime, when a commissioner upon whom a prisoner's freedom depends asks that prisoner if he or she is willing to discuss it, it is unrealistic to expect the prisoner to believe that a refusal truly is an option, given the likelihood that the Board would in fact hold it against the prisoner. Accordingly, the Board's request for petitioner, who had continually claimed his innocence, to nevertheless discuss the evidence and circumstances of the life crime unfairly placed petitioner in a catch-22 situation. (See Regs., § 2236.)

It is also noteworthy that petitioner acknowledged to the Board that his criminal activity was escalating in 1997, at the time of the life crime, and that it was just the kind of crime he was capable of committing then. He also expressed concern for the victim in particular and victims of violent crime generally, as well as regret for not helping the victim to attain justice by naming the person who came to petitioner's house in the victim's car at an earlier time. Thus, the evidence shows that petitioner expressed insight into his behavior at the time of the life crime and also showed remorse to the extent possible, given his continuing claim of innocence of this particular crime. (See Regs., § 2402, subds. (b) & (d)(3).) In light of this evidence, it is apparent that the Board's finding that petitioner lacked insight was improperly based, as was the evaluating psychologist's, on his failure to admit, explain, and show remorse for the life crime. (See *Jackson*, *supra*, 193 Cal.App.4th at p. 1390; Pen. Code, § 5011, subd. (b); Regs., § 2236.)

The Board's refusal to credit petitioner's explanations for the causes of his youthful criminality necessarily raises another question: whether the Board did in fact take into account that petitioner was a juvenile at the time of the life crime, as is

32

statutorily required.  Section 4801, subdivision (c) mandates that when a prisoner committed the life crime before attaining 23 years of age, the Board, in reviewing his or her suitability for parole, "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c); see also § 3051, subd. (f)(1) ["In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual"].)  In *Graham v. Florida* (2010) 560 U.S. 48, 74-75 (*Graham*), the United States Supreme Court held that the Eighth Amendment prohibits states from sentencing a juvenile convicted of a nonhomicide offense to life imprisonment without the possibility of parole.  In *People v. Caballero* (2012) 55 Cal.4th 262, 265 (*Caballero*), our Supreme Court explained the reasoning behind the holding *Graham*:  The "high court stated that nonhomicide crimes differ from homicide crimes in a 'moral sense' and that a juvenile nonhomicide offender has a 'twice diminished moral culpability' as opposed to an adult convicted of murder—both because of his crime and because of his undeveloped moral sense. (*Graham*, . . . at pp. 69–70.)  The court relied on studies showing that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.  For example, parts of the brain involved in behavior control continue to mature through late adolescence.  [Citations.]  Juveniles are [also] more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults.' (*Id.* at p. 68, quoting *Roper v. Simmons* (2005) 543 U.S. 551, 570.)  No legitimate penological interest, the court concluded, justifies a life without parole sentence for juvenile nonhomicide offenders.  ([*Graham*], at pp. 74–75.)" (*Caballero*, at p. 265.)

33

Here, although the commissioners, as well as the evaluating psychologist, gave lip service to the need to afford "great weight" both "to the diminished culpability of juveniles as compared to adults" and to "any subsequent growth and increased maturity" of petitioner (§ 4801, subd. (c)), the record plainly reflects that they did not take this requirement seriously. The questions the Board asked, its reliance on the flawed psychological evaluation, and its failure to consider evidence showing both petitioner's reasons for turning to criminality in his early teens and his maturity since then reveal that it improperly held petitioner to the standard of an adult, failing to consider his " 'twice diminished moral culpability,' " for the nonhomicide life crime, committed at the age of 16, in assessing his subsequent growth. (See *Caballero*, *supra*, 55 Cal.4th at p. 265, quoting *Graham, supra,* 560 U.S. at pp. 74-75; see also §§ 4801, subd. (c); 3051, subd. (f)(1).)

In fact, as we have already recounted, petitioner concluded with an explanation of how he had changed in the 17 years since he was a teenager willing to commit offenses like the life crime: "[B]ack then . . . my only self-worth valued from how other people saw me. I wanted to be a criminal. I think the difference now today is with maturity comes a complete different understanding of what you value. . . . Instead of seeing my father as being a failure, he's my rock, and I value family. I value hard work. I value struggles [that] shape you and make you who you are. . . . I value people's rights and their freedoms from being injured, all right, from the violence and stuff that crime perpetuates out there. Life is precious. . . . I value the struggle that it's been to go home . . . because I've learned something every step of the way. . . ." The Board's indifference to petitioner's young age at the time he committed his nonhomicide life crime, as well as the evidence of his pronounced growth and maturity in the many years since, did not comply with federal or California case law or California statutory law. (See *Graham, supra,* 560 U.S. at pp. 74-75; *Caballero*, *supra*, 55 Cal.4th at p. 265; §§ 4801, subd. (c); 3051, subd. (f)(1).)

In sum, we conclude the Board's finding that petitioner lacked insight was arbitrary in that it plainly was *not* "based on a factually identifiable deficiency in [petitioner's] perception and understanding . . . that . . . has some rational tendency to show that [he] currently poses an unreasonable risk of danger." (*In re Ryner*, *supra*, 196 Cal.App.4th at pp. 548-549; see also *Shaputis II, supra,* 53 Cal.4th at p. 221; cf. *In re Morganti* (2012) 204 Cal.App.4th 904, 925 ["Even if—as we do not believe—reasonable minds could find 'some evidence' in the record that [petitioner] lacks a satisfactory level of insight of some sort, the record is manifestly bereft of evidence connecting any such deficit to the conclusion he would present a risk to public safety if released on parole"].)

In denying parole, the Board also relied on petitioner's disciplinary history while in prison as showing an inability to comply with rules and as further evidence of his lack of insight. The commissioners observed that petitioner had received six CDC-115s between 2000 and 2012. It focused in particular on petitioner's most recent CDC-115, issued in April 2012 for excessive physical contact with his fiancée during a visit. The Board described this as "a very serious offense" that demonstrated petitioner's ongoing tendency to make "bad decisions," as he did when he was a teenager. The Board also observed that he had been told to remain discipline free at his prior parole hearings. The only other CDC-115s petitioner received in the 10 years before the 2014 parole hearing were one in 2006 for "attempted overfamiliarity" after he touched a corrections officer on the back and one in 2008 when he pleaded guilty to conspiracy to introduce/distribute tobacco.[13] At the hearing, petitioner explained to the Board that he recognized his past habit of "rationalizing certain behavior" by asking himself whether he was hurting anyone, rather than whether his conduct was against the rules, which he now understood was, "of course, the right way."

---

[13] According to Dr. Smith, the evaluating psychologist, petitioner had previously received two CDC-115s for violent behavior, which Dr. Smith described as participation in a riot in 2000, when he was 19 years old, and battery on a peace officer in 2003, when he was 22 years old. Dr. Smith also reported that petitioner had been issued a CDC-128A in 2007 for disobeying "C status procedures."

Prison discipline, "like any other parole unsuitability factor, 'supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness.' [Citation.] Not every breach of prison rules provides rational support for a finding of unsuitability. [Citation.]" (*In re Hunter* (2012) 205 Cal.App.4th 1529, 1543, quoting *Shaputis II*, *supra*, 53 Cal.4th at p. 219; see also *Lawrence*, *supra*, 44 Cal.4th at p. 1225 ["the mere existence of a regulatory factor establishing unsuitability does not necessarily constitute 'some evidence' that the parolee's release unreasonably endangers public safety"].)

Here, we do not agree with respondent that petitioner's rules violations provided some evidence supporting a conclusion that he poses a threat to public safety. (See *In re Palermo*, *supra*, 171 Cal.App.4th at p. 1110.) This case is distinguishable from *In re Reed* (2009) 171 Cal.App.4th 1071, 1086, cited by respondent, in which the prisoner had been issued 11 CDC-115s and 19 CDC-128s. As the Board put it, "you seem to have a whole series of things where you rub up against the system and something doesn't go well." (*Id.* at p. 1079.) The prisoner's most recent CDC-128—for leaving work without permission—was issued shortly after his prior parole hearing, at which the Board had given a one-year denial and directed him to remain discipline free. (*Id.* at pp. 1084-1085.) Division Five of this District concluded the prisoner's recent misconduct was "sufficiently predictive of antisocial behavior to survive a due process challenge" because it provided some evidence that the prisoner would pose a threat to public safety if released based on his inability to follow the Board's direction to follow the rules, which "was not an isolated incident; instead it was part of an extensive history of institutional misconduct." (*Id.* at p. 1085.) The misconduct, which involved leaving work without the permission of his supervisor, also provided "some evidence" that the prisoner "will have difficulty maintaining employment." (*Ibid.*; see also *In re Hare* (2010) 189 Cal.App.4th 1278, 1293-1294 ["especially atrocious" nature of life crime, coupled with prisoner's conviction in prison of possessing an altered toothbrush that could be used as a weapon, justified governor's finding that prisoner continued to pose a threat to public safety].)

36

In this case, although petitioner had been issued a CDC-115 in 2012, following his prior parole hearing in 2011, at which he was directed to remain discipline free, unlike the prisoner in *Reed*, petitioner does not have an extensive history of rules violations. Indeed, his most recent violation took place approximately two and one-half years prior to the 2014 hearing, and the violation prior to that was some four years earlier, in 2008. Moreover, the evidence regarding his employment prospects shows that, unlike the prisoner in *Reed*, petitioner does *not* "lack[] the discipline necessary to keep a job [he] has secured." (*Reed*, *supra*, 171 Cal.App.4th at pp. 1082-1083.) In contrast to petitioner's few disciplinary violations are the great number of institutional activities that reflect realistic plans for release, including marketable skills and educational attainments, which "indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(8) & (9).)

At points during the parole hearing, the Board acknowledged petitioner's many educational and vocational accomplishments, his participation in numerous self-help programs, and his volunteer work as a literacy tutor while in prison.[14] The Board further acknowledged the significant outside support he has from his fiancée, family, and friends, and the strength of his parole plan. The commissioners nonetheless focused on petitioner's disciplinary history, in particular the 2012 CDC-115 he received for excessive physical contact with his fiancée during a visit, in making its decision. Indeed, it is hard to fathom the Board's conclusion that this young inmate's touching of his fiancée during a visit more than two years earlier constituted "a very serious offense,"

_____

[14] For example, petitioner received a laudatory chrono in January 2014 from his fiber optics instructor, who described his performance as "excellent" and noted that "[h]e has made special effort in helping other students in understanding the daily operations of class learning and procedures. He has shown nothing less than a professional positive attitude toward both staff and inmates. He is very much appreciated and is a pleasure to work with. He has completed the program in Network Cable Technician." He also received two laudatory chronos regarding his investment of time in performing literacy tutoring with other inmates, in which his courtesy and ability to work well with staff and inmates was noted.

which demonstrated current dangerousness. (See *Prather, supra,* 50 Cal.4th at p. 255 [Board "must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the full record"]; accord, *Young, supra,* 204 Cal.App.4th at p. 303.) Even assuming petitioner's disciplinary history, including the most recent violation that took place over two years before the 2014 parole hearing, could be said to provide some evidence that he "engaged in serious misconduct in prison" under the regulations (see Regs., § 2402, subd. (c)(6)), that history plainly does not provide any evidence indicating a rational nexus between the misconduct and the Board's conclusion that he poses a current danger to public safety. (See *Shaputis II, supra*, 53 Cal.4th at p. 219; *Lawrence*, *supra*, 44 Cal.4th at pp. 1191, 1225; see also *In re Lee* (2006) 143 Cal.App.4th 1400, 1408 ["The test is not whether some evidence supports the reasons the Governor [or Board] cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*"].)

In conclusion, it must be remembered that petitioner was 16 years old at the time of the life crime. That crime, while extremely serious, did not result in the victim's death, or even his injury. And, at the time of the 2014 parole hearing, petitioner had already spent some 15 years in prison for the crime, including over eight years after he was first eligible for parole, in 2005. During those years, the record reflects that he grew in maturity and demonstrated success in a host of educational, vocational, self-help, and volunteer activities. It is clear that the Board ignored this relevant evidence, focusing solely on petitioner's alleged lack of insight, which was based impermissibly on his refusal to admit having committed the life crime, and his disciplinary record in prison to support its decision. (See *Stoneroad*, *supra*, 215 Cal.App.4th at p. 627.) Because, as discussed, those two factors do not provide some evidence demonstrating that petitioner poses a current threat to public safety, the Board's decision from petitioner's 2014 parole

hearing cannot stand.  (See *Shaputis II, supra,* 53 Cal.4th at p. 209; *Lawrence*, *supra*, 44 Cal.4th at p. 1225.)[15]

## B.  *The Board's Denial of Parole in 2016*

In its decision at the conclusion of the April 2016 hearing, the Board made explicit what was implicit in its 2014 decision:  Petitioner's ongoing assertion that he was innocent of the life crime was simply unacceptable and required that his parole request be denied.

The behavior of the commissioners at this hearing was outrageous.  Petitioner had remained free of any discipline since 2012, had excelled in his educational, vocational, self-help, and volunteer activities, had positive family support and a strong parole plan, and had—as discussed in part I.A., *ante*—already expressed significant insight regarding and remorse for his youthful criminality.  Therefore, the panel zeroed in on a ground for denying parole that was not mentioned at the prior hearing:  petitioner's claim of innocence was implausible in light of the evidence against him, and his explanation of what had occurred was not credible.  The commissioners gave lip service to petitioner's statutory and regulatory right to maintain his innocence and refuse to discuss the facts of the life crime, with such refusal not being held against him (see Pen. Code, § 5011, subd. (b); Regs., § 2236), but then proceeded to hound him about the details of the crime and his version of events.

Although the presiding commissioner stated at the start of the hearing that "[w]e're not here to retry" the life crime, that is precisely what the deputy commissioner proceeded to do for a large portion of the hearing.  Moreover, while petitioner's counsel had stated at the start of the hearing that petitioner "will be exercising his [legal] right . . . not to testify to the underlying facts of the controlling offense or the crimes involved,"

---

[15] In light of this conclusion we need not address petitioner's secondary argument that even if one of the two factors—lack of insight or disciplinary history—relied on by the Board in denying parole was supported by some evidence, "this court cannot discount the probability that the Board's other unsupported factor of parole unsuitability injected arbitrariness into the Board's ultimate denial of parole.  [Citation.]"

the deputy commissioner immediately began questioning petitioner about the evidence against him at trial and the perceived improbability of his claim of innocence. As with the questioning at the 2014 hearing, it would have been extremely difficult for petitioner to maintain his silence in the face of this litany of improper questions, given that his future freedom was in the hands of these commissioners.

The impropriety and coerciveness of the lengthy cross-examination about the life crime at the 2016 hearing is particularly offensive given that it began immediately after petitioner's counsel stated that petitioner would not be discussing that crime. Then— even after petitioner answered every question the commissioners posed about the life crime, despite the impropriety of those questions, and even after he waived the attorney-client privilege to discuss what he told the attorney representing him at trial—the presiding commissioner, in explaining the reasons for the denial of parole, stated, unbelievably, "An inmate who refuses to interact with the Board at a parole hearing deprives the Board of a critical means of evaluating the risk to public safety . . . ." Thus, not only did the commissioners violate the Board's own regulations both when they aggressively questioned petitioner in detail about the facts of the life crime after counsel informed them that he was exercising his right to not discuss it and when they used his responses to all of their many questions against him, they also used his purported refusal to discuss the crime as an additional ground for denying him parole.

Respondent again insists that the Board had the right to rely on petitioner's refusal to admit guilt because his version of events was implausible, in light of all of the evidence against him. First, as we have explained, the Board's questioning of petitioner about the life crime and use of his claim of innocence to find current dangerousness was unlawful. (See Pen. Code, § 5011, subd. (b); Regs., § 2236.) Second, even putting aside the question of whether a new panel had the right to find petitioner's version of events implausible after the previous panel did not so find, his version was *not* implausible, as we have already explained. Again, the commissioners wrongly equated the fact that there was sufficient evidence to support a finding of guilt at trial with implausibility. (See pt.

40

I.A., *ante*; *Shaputis II*, *supra*, 53 Cal.4th at p. 216; *Palermo*, *supra*, 171 Cal.App.4th at p. 1112.)

The deputy commissioner also found it implausible that petitioner would put himself in a position of perhaps being convicted of the life crime by refusing to identify the actual perpetrator at trial. First, the commissioner was incorrect that petitioner had refused to identify the perpetrator either before or during trial. Although he did not give police the person's name, petitioner explained at the hearing that he *had* told his trial attorney the perpetrator's name, and his attorney had met with that person. Petitioner also said that, after he was found guilty, he had made a *Marsden* motion and told the court that he had provided his attorney with the name of the driver.[16] Thus, the commissioner arbitrarily rejected petitioner's testimony at the hearing that he had raised the issue with his attorney and the trial court.

Second, petitioner also explained to the panel that, as a teenager, his attitude was that "it's not my job to cooperate, I didn't do it, and it will be proven through the courts.

---

[16] Several exhibits, submitted with petitioner's 2016 traverse, corroborate petitioner's statements to the Board. First, in a November 30, 2016 declaration, petitioner's appellate counsel in his direct appeal states that petitioner told her that "his trial counsel failed to adequately represent him in several ways, including by failing to call as a witness for the defense that third party who [petitioner] identified as the driver. According to my notes, trial counsel told me that his predecessor counsel, the public defender, had told him that this third party and [petitioner] had a similar look. My notes indicate that trial counsel confirmed for me that [petitioner] had identified this third party for him, including the fact that the third party had driven by his house in the stolen vehicle on the evening in question, as [petitioner] also told me." Second, the reporter's transcript from a July 15, 1999 hearing on petitioner's motion for a new trial based on his trial counsel's alleged incompetency reflects that, following an in camera hearing with petitioner, the court said to counsel, "He told me he had given you a name of a person he thought committed the crime and wanted him subpoenaed," to which counsel replied, "I'll confirm that." Third, in a July 28, 2008 letter to petitioner from the Innocence Project, a research assistant responding to correspondence from petitioner, wrote, "please give the name and any contact information you may have for the man in your neighborhood who you believe is responsible for the carjacking. Why do you believe he would come forward now?"

41

And that was naïve and selfish of me . . . ." Petitioner then apologized to the commissioners "for who I was then. I've tried to demonstrate since then, you know, that I'm not 16 anymore, that I'm not impulsive, and that that's not who I want to be. And when I reflect on for two years [before trial] consistently having the opportunity to cooperate with the authorities and not doing it, it's one of the biggest regrets of my life." In finding petitioner's refusal to identify the driver implausible, the commissioner plainly was neither listening to petitioner's explanation, nor considering petitioner's youth and immaturity at the time, as he was required to do. (See, e.g., *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2464, fn. 5 [" 'It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance' "]; *Graham*, *supra*, 560 U.S. at p. 78 ["Juveniles mistrust adults and have limited understandings of the criminal justice system and the roles of the institutional actors within it. They are less likely than adults to work effectively with their lawyers to aid in their defense"]; see also *Swanigan*, *supra*, 240 Cal.App.4th at p. 19; *Jackson*, *supra*, 193 Cal.App.4th at pp. 1389-1390; § 4801, subd. (c).)

The Board's repeated failure to consider petitioner's youth at the time of the life crime, despite the explicit constitutional and statutory mandate to do so, is of great concern. (See, e.g., *Graham*, *supra*, 560 U.S. at pp. 74-75; *Caballero*, *supra*, 55 Cal.4th at p. 265; §§ 4801, subd. (c); 3051, subd. (f)(1).) In a recent report, submitted by petitioner as an exhibit with his 2016 traverse, the American Civil Liberties Union (ACLU) reports: "A 2012 study from the National Registry of Exonerations demonstrated that young people in particular are vulnerable to an erroneous arrest, conviction, and imprisonment . . . . [¶] For innocent prisoners, a parole board's resolute focus on the original offense and its need for remorse presents unique challenges. . . . [¶] Exonerated prisoners interviewed by the ACLU spoke of the emotional anguish they faced in these hearings, knowing that to protest their innocence could not help and might

42

hurt them." (ACLU Report (Nov. 2016) False Hope: Parole Systems Fail Youth Serving Extreme Sentences, p. 75.)

Finally, as at the 2014 hearing, in reaching their decision, the commissioners at the 2016 hearing relied on Dr. Smith's flawed psychological evaluation and assessment of dangerousness, in which she improperly based her findings on petitioner's refusal to take responsibility for the life crime. (See Pen. Code, § 5011, subd. (b); Regs., § 2236.)

The evidence from the 2016 hearing, examined together with the evidence from the 2014 hearing, compels us to conclude that the Board was determined to find a way to deny petitioner parole, even as the evidence supporting a finding of current dangerousness diminished with each year that went by. The records from both parole suitability hearings make clear that petitioner, a young man whose life crime, while serious, did not lead to any injuries and occurred some 19 years ago when petitioner was 16 years old, has been an exemplary prisoner for many years. He has repeatedly been lauded by his supervisors and has used his time in prison to achieve as much as possible educationally, vocationally, and personally, and has even, as he put it, been "paying it forward" by facilitating a group of young men with the goal of supporting them in becoming contributing members of society. Unable to justify petitioner's continued detention on any lawful ground, the commissioners at the 2016 hearing latched onto his continuing claim of innocence, violated the law, and improperly found him unsuitable based on his refusal to admit to having committed the life crime.[17]

---

[17] Petitioner has included, as an exhibit to his 2016 traverse, the Sacramento Superior Court's November 8, 2016 order, granting a petition for writ of habeas corpus filed by a prisoner who had been denied parole based on his refusal to admit guilt for the life crime. As relevant to this case, the court found "[m]ost concerning" statements by "Deputy Commissioner Hurd"—who was also the deputy commissioner at petitioner's 2016 parole hearing—"that petitioner's failure to obtain release is because he decided to 'marry that lie' and 'took the road of pretending' that he did not kill his wife, when in fact the Board believed he did. [Citation.]" The court continued: "His comment that '[t]he way it works these days, it doesn't matter when you come in and say I lied. On that day, you'd be amazed how things change to the better,' appears to be a thinly veiled

43

Like the 2014 decision, the Board's 2016 parole denial based on petitioner's failure to take responsibility for the life crime does not provide some evidence demonstrating that petitioner poses a current threat to public safety. The Board's decision, therefore, cannot stand. (See *Shaputis II, supra,* 53 Cal.4th at p. 209; *Lawrence, supra*, 44 Cal.4th at p. 1225.) In light of the fact that the Board has now rendered two decisions that are contrary to law and not supported by any evidence of current dangerousness, we shall make the following order proposed by petitioner's counsel at oral argument: Upon remand of this case, the Board will have 35 days to do one of the following: (1) It may choose to review the full record to determine whether there is any evidence, which does not rely on the purported evidence of petitioner's dangerousness rejected in this opinion, that it believes could provide a basis for finding that petitioner is currently dangerous. (See *Prather, supra*, 50 Cal.4th at p. 258 ["a judicial order granting habeas corpus relief implicitly precludes the Board from again denying parole—unless some *additional* evidence (considered alone or in conjunction with other evidence in the record, and not already considered and rejected by the reviewing court) supports a determination that the prisoner remains currently dangerous"].) If any such evidence is found in the record, the Board shall immediately set an expedited parole hearing, at which the additional evidence can be explored and petitioner's parole suitability determined. If no such additional evidence suggesting current dangerousness is found during the review of the record, petitioner shall be granted parole immediately, subject to the Governor's review. (See Cal. Const., art. V, § 8, subd (b); Pen. Code, § 3041.2; *Prather*, at p. 251.) (2) In the alternative, the Board may choose to hold an expedited

advisement that parole is conditioned upon petitioner confessing to the crime, which is unlawful." The quoted words, some of which echo those used at petitioner's 2016 hearing, provide additional evidence of this commissioner's willingness to disregard the Board's regulations. (See Regs., § 2236.)

44

parole hearing within 35 days of remand, in the first instance, consistent with due process and this decision. (See *Prather*, at p. 258.)[18]

## II. *The Board's Failure to Set a Base Term*

Petitioner contends the Board improperly failed to calculate a base term at either the 2014 or the 2016 parole hearing, in violation of a stipulated order issued by this court on December 16, 2013, which settled a dispute between the Board and Roy Butler, a parole-eligible life prisoner. (See *In re Butler* (2015) 236 Cal.App.4th 1222, 1229 (*Butler*) [in opinion related to attorney fees dispute in *Butler*, this court recounted procedural background of case, which included a stipulated order providing that Board will set base and adjusted base terms at inmate's initial parole hearing].)

The Board recently set a base term and adjusted base term of 10 years for petitioner. Because the Board has calculated petitioner's base and adjusted base terms, albeit belatedly, we find that the issue is now moot.[19] (See, e.g., *Giraldo v. California Dept. of Corrections and Rehabilitation* (2008) 168 Cal.App.4th 231, 257 ["An issue

---

[18] In a letter sent to counsel in advance of oral argument, we asked them to be prepared to address what would be the appropriate remedy in the event we determined the two Board decisions denying parole must be vacated. At oral argument, respondent initially suggested setting an expedited parole hearing within 35 days of remand, based on the fact that there are no registered victims in this case, which means that 30 days' notice to law enforcement, the District Attorney, and petitioner's trial counsel would be sufficient under section 3042, subdivision (a), with the understanding that the Board would be entitled to review both old and new evidence. Respondent subsequently agreed that a less formal review, also within 35 days, would be acceptable, with a new parole hearing to be scheduled only if determined to be necessary, following such a review. We believe the Board is in the best position to determine which of these alternatives is logistically preferable in this case.

[19] We nonetheless observe that petitioner has now been in prison for some 17 years, more than 7 years longer than the 10 years calculated as his base term. (See *Butler*, *supra*, 236 Cal.App.4th at pp. 1241-1244 [setting of base term assists Board and reviewing court in determining proportionality of sentence].)

becomes moot when some event has occurred which 'deprive[s] the controversy of its life' "].)[20]

## DISPOSITION

The consolidated petitions for writ of habeas corpus are granted and the decisions of the Board of Parole Hearings are hereby vacated. The matter is remanded to the Board for further proceedings as set forth herein, consistent with due process of law and this decision. (See *Prather*, *supra*, 50 Cal.4th at p. 244.)


_____

Kline, P.J.


We concur:


_____

Stewart, J.


_____

Miller, J.

---

[20] We therefore deny, as unnecessary to our resolution of this issue, respondent's request that we take judicial notice of the California Supreme Court's recent grant of review of our order denying the Board's motion to modify the stipulated order in *In re Butler*. (See *In re Butler*, review granted Nov. 16, 2016, S237014.)

46

Trial Court:                              Solano County Superior Court

Trial Judge:                             Hon. David Edwin Power


Attorneys for Petitioner:                Michael Satris
                                         Law Office of Michael Satris
                                         By Appointment of the Court of Appeal
                                         Under the First District Appellate Project


Attorneys for Respondent:                Office of the Attorney General

                                         Kamala D. Harris
                                         Attorney General of California

                                         Jennifer A. Neill
                                         Senior Assistant Attorney General

                                         Sara J. Romano
                                         Supervising Deputy Attorney General

                                         Amanda J. Murray
                                         Deputy Attorney General