Filed 6/22/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DARRYL POOLE,<br><br>      on Habeas Corpus. | A152341<br><br>(Alameda County<br>Super. Ct. No. 96274) |

Convicted of a second degree murder committed in 1988, petitioner Darryl Poole was sentenced to a prison term of 20 years to life. He contends the Board of Parole Hearings acted arbitrarily in finding him unsuitable for release on parole in that there was not "some evidence" he posed a current danger to public safety. Additionally, he challenges the Board's application of Marsy's Law, enacted subsequent to his offense, as imposing ex post facto punishment, and argues that the Board's appointment procedures and compensation limits for attorneys appointed to represent inmates at parole hearings deprive him and other inmates of effective assistance of counsel. We find no evidence in the record to support the Board's determination that petitioner presents a current danger to the public. Accordingly, the Board's decision cannot stand.[1]

**BACKGROUND**

Petitioner was 19 years old when, driving on the freeway in Oakland, he shot an assault rifle out of the driver's window, killing the driver of a car in the next lane. Petitioner had been a narcotics dealer for several years. As he described the events, on

---

[1] The two other issues raised by the supplemental petition are distinct from the question of petitioner's suitability for parole. By order of June 13, 2018, we bifurcated the petition into two separate cases. The first, challenging the denial of parole, is the case we decide in this opinion. The issues concerning the Board's application of Marsy's Law and compensation of appointed counsel, will be considered in a new case No. A154517.

1

the night of the shooting, he and two young men who sold narcotics for him, Marvin Grant and Brian Brooks, went to San Francisco to meet up with one of Grant's girlfriends, Knox, and her friends, taking assault rifles with them. After drinking and smoking marijuana, they drove with Knox and her friend to a location near Third Street, where they got out of the car to talk to some young people who were hanging out. Grant went to relieve himself behind a utility box and ran back saying someone in a truck had pointed a gun at him and then driven away.

The group got into the car and, as they began to drive toward Oakland, Grant saw the truck. Petitioner pulled up to the truck and Grant leaned out the window and started shooting at it. The truck took off, petitioner gave chase, and Grant shot out the truck's rear window. Petitioner's car was then caught in the congestion of traffic getting onto the Bay Bridge. When the traffic started to move, petitioner drove across the bridge at a high rate of speed, weaving in and out of lanes. Once in the Oakland area, the traffic slowed a bit. Petitioner pulled out an assault rifle and shot into a car that was slightly ahead in the fast lane, to his left. The driver of that car, Lawrence Ellingsen, was shot in the head and killed instantly; his foot pressed on the accelerator and the car sped at around 90 miles per hour until his wife, in the passenger seat, was able to pull her husband's foot off the pedal, steer the car to the side of the freeway, and stop it with the emergency brake. Petitioner drove past and exited the freeway at Embarcadero, where the group stopped in a dark area, got out and "used the bathroom," after which they drove to petitioner's house.

Petitioner was arrested, pursuant to an arrest warrant, on December 3, 1988. He initially denied participating in the murder, going to San Francisco that night, being on the 880 Freeway or knowing Knox, then admitted being in the car but claimed Knox fired the shot, then later admitted shooting in the direction of the Ellingsens' car and seeing the windshield shatter and the car speed away and then pull over.

Petitioner was convicted on February 8, 1990, after a jury trial. His first parole suitability hearing was in 2002. He was denied parole at that hearing and in 2007 and 2011. In 2014, a petition to advance his next hearing was granted but the hearing was

2

then postponed twice, and in 2015 he was denied parole for three years. An administrative review on September 12, 2016, resulted in his next hearing being held on April 5, 2017.

As related in his 2017 Comprehensive Risk Assessment, petitioner grew up with a mother who was verbally abusive and a stepfather who was both physically and emotionally abusive toward the entire family, and until age 15 or 16 felt "invisible, insecure and unworthy." His older brothers ran away and were then placed in foster care when petitioner was seven or eight years old, leaving him feeling abandoned. Though a friendship with his stepfather's nephew, petitioner had begun to engage in criminal activity, and by 16 he was selling cocaine. At age 16 he intervened in an incident of domestic violence between his stepfather and his mother, striking his stepfather in the head with the leg of a chair, and he began to feel "untouchable and invincible." His criminal behavior escalated as he hung around with antisocial and criminal peers, sold narcotics and carried weapons. His mother moved to Minnesota, leaving petitioner to live with his brother and contributing to petitioner's feeling of abandonment. Petitioner then moved into a house with a group of older people who were selling drugs. Petitioner had dropped out of school after failing tenth grade. He enrolled in Job Corps., where he obtained a GED, but was expelled for fighting. He was fired from or left jobs due to his criminality.

At the time of the life crime, petitioner was supporting himself through narcotics sales. He testified at the hearing that he was neither a big nor a small dealer: He made enough money to pay rent, buy guns, alcohol and drugs to sell, and have two people work for him selling drugs. He was living with his girlfriend, who gave birth to their daughter in January 1989, after petitioner's arrest and incarceration. He had a history of arrests for possession of narcotics for sale, carrying a concealed weapon, domestic violence, and driving under the influence; he admitted that he had " 'no regard for human life' " and was " 'recklessly violent.' " He had a history of alcohol dependence beginning at age 14, with occasional use of marijuana and experimentation with cocaine, which he saw as influencing his violent behavior in that he felt " 'bolder' " when he was drinking.

3

Petitioner's misconduct continued during his incarceration, with seven rules violations, four of which were for violence—fighting in 1993, fist fight in 1995 and two batteries on an inmate in 1999. His most recent rules violation was in 2007, for possession of a cell phone. He also had 12 counseling "chronos" between 1990 and 2009, the last for "overfamiliarity with a female officer" when he asked if she had a twin upon seeing her working an overtime shift.

Petitioner gradually began to change his behavior. Since 1997, he had participated in, completed or facilitated numerous self-help programs; had become a mentor in the Substance Abuse Program (SAP) and Long-Term Offender Program, become a certified alcohol and substance abuse counselor, with over 6000 internship hours accumulated, and earned an AA degree from Lassen Community College. He had completed several vocational programs and taken numerous courses, and had "numerous laudatory Chrono's in his file commending him for his positive attitude, helpful and respectful demeanor, and leadership qualities." His work supervisors' reports had been "quite favorable, reflecting exceptional, above average, and satisfactory performance ratings throughout his incarceration."

The psychologists who assessed petitioner in 2010, 2015 and 2017 all concluded his risk of violence in the community was low. The 2017 risk assessment stated that petitioner "presents with no clinical risk factors." While he "presents with nearly every historical risk factor," "all of them are considered to be of low relevance to the current assessment of risk" because he had not been violent since 1999, his antisocial behaviors had "diminished considerably," he scored lower than the mean of North American male offenders and "well below" the threshold commonly used to identify "dissocial or psychopathic personality," he had developed many skills that made him a "viable candidate for a good job in the community," he had been successful in sobriety and had "good supports and proactive measures in place" to prevent relapse, he had been compliant with all rules and regulations since at least 2009, and his "treatment responsivity" had been positive for at least 10 years. He had "appropriate plans for professional services such as continuing to attend Al-Anon and [Alcoholics

4

Anonymous]" and for transitional housing, with flexibility about placement, good job skills and ideas for where to get help finding a job, support in the community, and there was "no indication that he would have any problems with supervision or treatment compliance in the relatively near future."

The sole issue of concern at the hearing was petitioner's reason for the shooting. As will be described, petitioner related shooting because he needed to evade the police, or retaliation from the occupants of the truck Grant had shot at, and the Ellingsens' car was in his way. He also described motivations including wanting to impress Grant and prove himself as a leader to his criminal associates. The commissioners dismissed most of petitioner's explanations and concluded—contrary to the psychologists who evaluated him in 2010, 2015, and 2017—that he lacked insight into the "real" reasons for his crime.

## DISCUSSION

### I.

" ' "Subdivision (b) of [Penal Code] section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual,' " ' and mandates that the Board 'normally' set a parole date for an eligible inmate, and must do so unless it determines [that] an inmate poses a current threat to public safety. ([*In re*] *Prather* [(2010)] 50 Cal.4th [238,] 249 [(*Prather*)], quoting *In re Lawrence* (2008) 44 Cal.4th 1181, 1202 (*Lawrence*).) As a result, parole applicants have a 'due process liberty interest in parole' and ' "an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." ' (*Lawrence,* at pp. 1191, 1204, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 (*Rosenkrantz*).)" (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 615 (*Stoneroad*).)

" 'We review the Board's decision under a "highly deferential 'some evidence' standard." ' (*In re Young* (2012) 204 Cal.App.4th 288, 302 (*Young*), quoting *In re*

5

*Shaputis* (2011) 53 Cal.4th 192, 221 (*Shaputis II*).) '[T]he appellate court must uphold the decision of the Board or the Governor "unless it is arbitrary or procedurally flawed," and it "reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision." (*Shaputis II*, at p. 221.) "The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Ibid*.) At the same time . . . the Board's decision must " 'reflect[ ] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards.' " (*Shaputis II*, at p. 210, quoting [*In re*] *Rosenkrantz, supra,* 29 Cal.4th at p. 677, and citing *Lawrence, supra,* 44 Cal.4th at p. 1204, and [*In re Shaputis* (2008) ] 44 Cal.4th [1241,] 1260–1261 [(*Shaputis I*)].)' (*Stoneroad, supra,* 215 Cal.App.4th at p. 616.) We are required to affirm a denial of parole 'unless the Board decision does not reflect due consideration of all relevant statutory and regulatory factors or is not supported by a modicum of evidence in the record rationally indicative of current dangerousness, not mere guesswork.' (*Ibid*.)

"The nexus to current dangerousness is critical. '*Lawrence* and *Shaputis I* "clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon 'some evidence' supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely 'some evidence' supporting the Board's or the Governor's characterization of facts contained in the record." (*Prather*, [*supra,* 50 Cal.4th] at pp. 251–252.)' (*Stoneroad, supra,* 215 Cal.App.4th at p. 615.) ' "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public." (*Lawrence,* [*supra*, 44 Cal.4th] at p. 1212, italics added.) The Board "must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record." (*Prather*, . . . at p. 255, italics added.)' (*Young, supra,* 204 Cal.App.4th at p. 303.)

' "[T]he proper articulation of the standard of review is whether there exists 'some evidence' demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence, . . .* at p. 1191.)' ([*Prather*], at pp. 251–252.)' (*Shaputis II, supra,* 53 Cal.4th at p. 209.)" (*In re Perez* (2016) 7 Cal.App.5th 65, 84–85.)

The Board found that petitioner posed an unreasonable risk and was therefore not suitable for release because it found his "version" and "understanding" of the life crime "significantly lacking"—"basically it's an insight only." The presiding commissioner discussed petitioner having initially testified that he was concerned about being pursued by the police or the people in the truck, then "as we go through the hearing, we find out that's not the case" and, instead, "you're trying to impress Mr. Grant." The commissioner did not believe this explanation of the crime, as Grant worked for petitioner and the commissioner felt petitioner had been unable to explain why he was trying to impress Grant or how shooting Ellingsen would impress him. The commissioner also told petitioner he "felt like he was trying to pull a molar. I usually don't have to ask that many questions, sir. Usually it just comes out, cause it's been addressed." Observing that "the doctors" had found petitioner would present a low risk of violence if released, the presiding commissioner said, "I don't think they're really getting it. No disrespect to the doctors but I do not agree with their assessment. I don't think you've addressed the causative factors of the crime."

The deputy commissioner, agreeing, told petitioner his credibility suffered because the commissioners at his hearing in 2015 made it clear they did not believe "the story about fleeing from something chasing you on the freeway" but petitioner repeated that story at the present hearing and "stuck with it until I basically had to corner you into admitting . . . there was no truth in that." The deputy commissioner viewed this as minimization "because you're suggesting that there was some real reason that you had to get down the freeway at 100 miles an hour." The commissioner found petitioner had not identified or addressed the causative factors of the crime and criticized petitioner's description of his "character defects" as "criminal, violent, sarcastic, pariah, angry and

7

procrastination"; the commissioner suggested an applicable list might be "greedy, devious, deceptive, cruel, uncompassionate, intolerant, manipulative, vengeful, self-indulgent, destructive, selfish."

As we explained in *Perez*, the California Supreme Court made clear in *Shaputis II* that " '[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term "insight," but they direct the Board to consider the inmate's "past and present attitude toward the crime" ([Cal. Code] Regs., [tit. 15,] § 2402, subd. (b)) and "the presence of remorse," expressly including indications that the inmate "understands the nature and magnitude of the offense." (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of "insight." ' (*Shaputis II*, [*supra*, 53 Cal.4th] at p. 218.) '[T]he presence or absence of insight is a significant factor in determining whether there is a "rational nexus" between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. (*Lawrence,* [*supra,* 44 Cal.4th] at p. 1227; see also *Shaputis I*, [*supra*, 44 Cal.4th] at p. 1261, fn. 20.)' (*Shaputis II*, at p. 218.) Still, 'the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger.' (*In re Ryner* (2011) 196 Cal.App.4th 533, 548–549.) It has been noted that an inmate's lack of insight has taken the place of the heinous nature of the commitment offense as a standard reason to deny parole, 'so much so that it has been dubbed the " 'new talisman' " for denying parole.' (*Id.* at p. 547.)" (*Perez, supra,* 7 Cal.App.5th at pp. 85-86.)

Petitioner testified at the 2017 hearing that his criminality began because he wanted to "fit in," having "always felt like the oddball out" and that he "wasn't strong enough to be by myself." He also began drinking alcohol to "fit in," but later he drank "to hide and get away" and then because "drinking made me feel bolder" and "made it easy for me to, um, run around with the people that were anti-social and criminal." He

8

had a lot of guns because "in the drug trade, the more guns was . . . status" and had an "AK" because it was "the biggest gun that I can buy and I knew that would do more damage," which he wanted because, as a drug dealer, he knew he had to be the "baddest" and "craziest one."

Discussing the murder, petitioner referred frequently to the "person he was" at the time:  An angry, impulsive and violent drug dealer with no value for life and a perceived need to enhance his stature in the eyes of his criminal associates.  Throughout the hearing, the commissioners rejected petitioner's explanations of his thoughts and actions as illogical and petitioner agreed that they were *in fact* illogical, but returned to the person he was and way he thought then.

Describing the course of events leading up to the murder, petitioner testified that he felt panicked when his car became stuck in traffic after Grant shot at the truck, and sped across the Bay Bridge, because he wanted to "flee," thinking the police might be coming or the truck might come back.  To various questions and comments expressing the commissioners' disbelief that petitioner actually thought he was being pursued, petitioner acknowledged that *in fact* neither the police nor the truck were after him, but said these were things in his mind at the time, due to his criminal mind set.  For example, petitioner explained, "why I always say that because I—and I speak on that is the person who I was then.  If somebody would of shot at me, I would have somehow tried to turn around and come after 'em.  So I have these thoughts that thinking they might and evade capture 'cause I don't know if, um, after Marvin Grant was shooting, um, . . . in the streets at that—at the truck, I don't know if—if the police had saw and they might be coming behind us."[2]

---

[2] Making the same point later, petitioner told the commissioners, "Now I'm saying in my thought patterns back then, I'm thinking they could 'cause if—I don't know if they would or not, but did they? No.  They—couldn't of. . . .  [W]hen I speak about . . . the police . . . thinking they might be com[ing], I'm—I'm a criminal.  I'm immersed into this—in this lifestyle.  And one of the things is anytime I do something that's criminal, [I'm a] always think that the police is coming after me or—or they might be coming. . . ."

Asked his motive for shooting Ellingsen, petitioner said that Grant had shot at the truck and he felt "I can do the same thing to prove myself." The presiding commissioner questioned how he could have thought the situations were similar, since Grant shot because he thought someone in the truck had pointed a gun at him and no one in Ellingsen's car had done anything to petitioner; when petitioner said he wanted the car to speed up and get out of his way, the commissioner again challenged the reasoning, saying shooting the driver was not likely to get petitioner anywhere faster. Petitioner responded, "Truly. But at that time, you're talking to the person who I was then? . . . I didn't look at it to how I'm looking at it today. [The] way I look[] at it today, I'm gonna make them speed up and get out of my way so that I can get through the traffic 'cause they was blocking me." Having seen the truck speed away when Grant shot at it, petitioner said, "I see the same thing happening here." Petitioner recognized that shooting an assault rifle at a car had a "high probability" of killing someone, but "this is how I handle conflict all my life. It was the—with violence. You know, it was the extreme violence." Petitioner said, "[t]he why doesn't make sense, why I would do that. Yeah, but at that time, that was the person who I was (inaudible) . . . ." The commissioner, frustrated that he "still d[id]n't know why you did what you did," said it was "insane" to fire an AK-47 into a car to get it out of the way and asked "what was it about you that would have you do that?"[3] Asked whether he thought being under the influence of drugs or alcohol was a causative factor, petitioner said that might have had something to do with it but it "wasn't a main fact." Petitioner said, "I was a criminal. I was violent. I was angry. I like to—I wanted to fit in. Me fittin' in with—with my extreme violence, I would do . . . extreme

---

[3] The commissioner's frustration with petitioner was evident throughout the hearing. Early in the hearing, after petitioner's first few responses when asked what factors concerned him with respect to potential substance abuse relapse, the commissioner apologized for raising his voice. Questioning petitioner about his motive for shooting into the car, the commissioner said, "I'm not thinking this is a complicated question . . . and God knows . . . if there's one thing that I hope and that you've thought about why you did what you did, right?"

violence to fit in with my group peers . . . . [A]t that time when I'm doing something violent, . . . it helped me with the group of people that I was around."

The commissioner questioned this reasoning, too, asking how it could help petitioner fit in when the people he was shooting at were not "gang member[s] or drug dealers or other people that are firing guns"; petitioner acknowledged again that it was "senseless," but at the time he did not "think things through" and did not value people other than himself. Because he did not feel valued growing up, petitioner said, he devalued people easily and it was "easy" for him to do violent things.

Asked for his "insight" on the crime, petitioner again said he was trying to prove himself to Grant, and the commissioner again dismissed the point. When petitioner referred to "the person I was then" and "underlying anger that I had back then that dealing with conflict," the commissioner questioned why Grant would have been impressed by petitioner killing an innocent driver. Petitioner said, "that was my warped thinking at the time . . . the person who I was then, that's how I—I viewed that life. That's how I viewed, um, uh, me doing the things that I was gonna do that it was gonna impress people. Was it the right thing? No." Petitioner said he knew it did not make sense and was hard for people to understand, but as a result of being told he was worthless by his parents, he was trying to demonstrate he could do something he felt he needed to do for his "leadership" role among his criminal peers.[4] Petitioner did not know he was going to murder Ellingsen, but he knew that by shooting into the car he *could* murder someone. He said he was no longer the person he was then, but "I know who the

_____

[4] Petitioner said, "me shooting, you know, at and murdering Mr. Ellingsen, an innocent bystander, you know, it was like—it's hard for everybody to see that me trying to fit in. But at—the person who I was then, you know, that's how I viewed life. . . . I was the person who my—when my parents talked about you again never gonna amount to nothing . . . right at this moment, . . . this was me, you know, gonna show everybody that I can." Referring again to Grant shooting at the truck, petitioner said, "I'm 'posed to be like in the leadership role, you know, I felt I had to do this, you know. This was something that I would—I would do to help me fit in. And yeah, my thought process at the time was like, yeah, I'm gonna show, uh, Marvin Grant that I can do this too and everybody, you know."

11

person I was with dealing with my anger, you know. . . . this is how I deal with conflict. This is how I deal with all situations."

Here the commissioner interjected that petitioner did not have a history of violence —an observation impossible to reconcile with the history that petitioner related and was documented in his records, as was later confirmed when the deputy commissioner asked petitioner about "all this raising hell in jail . . . [a]ssaulting police officers . . . the records saturated with it, right?" Petitioner acknowledged he had not been sent to jail for violence prior to the life crime, but explained again that this was what he learned from the domestic violence he grew up with and, later, from his older criminal associates telling him, "if you pull a gun out, you gotta use it. If you fight with somebody, you gotta make sure you win." Asked what he proved by shooting Ellingsen, petitioner replied that he proved to Grant that "I can do what you did too," that "I can get everybody up out of this situation" and that "it was nothing for me to . . . shoot into somebody car and then later on when everybody find out that I murdered somebody, hey, I murdered . . . this is me. I did that."

At this point, the deputy commissioner challenged petitioner's testimony that he was afraid of being pursued as "unrealistic" and elicited petitioner's acknowledgment that he knew at the time that neither the police nor the people in the truck were coming, that shooting at the Ellingsens' car would not be likely to get him anywhere faster and that he had already proved to Grant that he was "with him" by chasing the truck. In response to further questions, petitioner acknowledged he was not in a panic, not afraid of the police and not afraid of the truck, that it took a lot of effort to shoot the assault rifle as he did, and that when he told his passengers, "[I'm a] make these motherfuckers speed up" he "basically meant to say I think I'll shoot at these motherfuckers . . . [b]ecause that's the kind of guy you were."

After telling petitioner that his explanations about being in a panic and needing to speed up because of the police and the truck were "nonsense" that he should not repeat in the future, justifications for what he did rather than actually what he was thinking, the deputy commissioner asked petitioner about his character defects. Petitioner said he was

12

"a criminal," and "violence, sarcastic, . . . a pariah. I was angry." The commissioner rejected petitioner's first response when asked who he was angry at—his mother and stepfather—telling him anger is an "immediate emotion that's directed at a particular situation." Asked if he was angry at someone on the night of the crime, petitioner said he was angry at the person who pulled a gun on Grant, but the commissioner expressed disbelief and told petitioner, "[y]ou were delighted to be able to chase the truck." Petitioner acknowledged this, as well as that he was "looking for trouble" when he went to San Francisco with all the guns, but said there was anger at the same time. The commissioner rejected petitioner's point, saying anger "doesn't fit the picture" and "doesn't seem to be your problem.

The deputy commissioner told petitioner that all the things to which he initially attributed his problems, such as worries about people not liking him, being unworthy, and not asking for help as a youngster, were things he had no control over, while the factors he later acknowledged under questioning—desire for power, money and sex—were things he did have control over. Petitioner's response reflects his understanding of how the things he could not control contributed to the development of his criminality: "I didn't have no control over . . . domestic violence in the household . . . dealing with . . . violence. Dealing with . . . CPS coming in the house. . . . And a lot of that . . . had to do with me stuffin' my feeling and holdin' 'em in. So the feelings that come up on . . . a lot of that is dealing with . . . abandonment, betrayal, anger. And a lot of that led to my lifestyle. Because anytime them feelings probably came up in the lifestyle of me selling drugs, you know, and—and then I'm gonna react. . . and I'm gonna react in violence because I didn't have the tools that I'm—that I have today."

Rather than recognize that petitioner was trying to explain how he came to be a violent person, the presiding commissioner told petitioner that what he was describing— an "unstable social life" growing up—was "an aggravating factor" for violence and unsuitability because "[t]he studies show that those are factors that don't change and . . . lead to increased violence." When petitioner stated that this would be mitigated by his long history of "doing self-help," "dealing with pro-social people" and the support he

13

would have in the community, the commissioner dismissed his point, again saying that having an unstable social history predicted the violence that petitioner engaged in. The presiding commissioner said they were trying to determine whether petitioner had "really identified what got you here in the first place" because petitioner's repeated references to needing to get away from the police and truck were "wrong," and petitioner tried to explain that he knew this was not actually the reason he shot into the Ellingsens' car. Petitioner agreed when the deputy commissioner told him the "bottom line" was that "somebody died because you were putting on a show for your friends and you thought that was gonna enhance your leadership role."

In sum, petitioner told the Board that he fired the assault rifle into the Ellingsen's car because he perceived it to be an obstacle, he had grown up learning to respond to problems with violence, he did not value life, he wanted to impress his associates that he was as tough as Grant, and shooting into a stranger's car was something that he saw as enhancing his image as a tough, violent drug dealer. He recognized that none of this made logical sense, but it was the way he thought at the time, which he attributed to his need to overcome the lack of self-esteem and self-worth he had felt as a child by making himself a powerful and dangerous figure in the criminal life he had adopted.

It is unclear what greater insight the Board could have been looking for. The commissioners saw petitioner as insisting on explanations for the shooting that were untrue and eventually, under questioning, changing his story to acknowledge they were not true. Despite his failure to make the point clear at the outset, however, petitioner's acceptance at the hearing that his desire to evade the police or retaliation from the truck occupants was not the true motivator for his choice to shoot into the Ellingsens' car was not a "new" insight discovered at the hearing: The 2010, 2015 and 2017 risk assessments related petitioner's awareness of factors such as his anger, impulsivity, low sense of self-worth, desire to impress others and failure to consider or care about consequences as having contributed to his crime, and his understanding that these aspects of his character had arisen from his childhood abuse, exposure to violence and feelings of worthlessness. He told the evaluator in 2017 that he "realize[d] that trying to flee, or evade capture, as he

14

said previously, was not the reason that he shot Mr. Ellingsen"—" 'those were just thoughts, not facts.' "

It is true that petitioner referred often to his perception at the time of the murder that he needed to get off the freeway quickly to avoid apprehension, and therefore saw the Ellingsens' car as an obstacle. Read in context, however, there is no support for the deputy commissioner's view that petitioner was trying to minimize his offense by suggesting there was a "real reason" he needed to drive at 100 miles per hour. Petitioner repeatedly stated that his thoughts at the time of the offense were not the "real" reason and that he was fully responsible for his unjustified, horrific act. As he put it at the 2015 hearing, the police and truck were the "superficial" factors at the time, but the "underlining [*sic*], you know, of why I did everything, when I look back at it" was "low self-worth," wanting to "prove . . . something to everybody that was in the car," anger from his childhood causing him to "act out violently," lack of impulse control, failure to consider consequences and his substance abuse. Appellant's articulation of his point was less clear at the 2017 hearing, but he expressed the distinction between the superficial motivations he initially referred to in describing his thinking at the time of the shooting and the deeper internal motivations that were the true reasons for his conduct.[5]

Indeed, the underlying anger, need to impress and be accepted by his peers, resort to violence to resolve conflict and to enhance his stature in their eyes, that petitioner discussed were viewed by the psychologists who evaluated him as reflecting his developing insight. The 2010 risk assessment, in stating that petitioner had developed "some insight into the contributory factors of the life crime" and made "noticeable progress in gaining insight into his crime and other antisocial acts," noted that petitioner was aware of his "anger, impulsivity, and his desires to impress others without

---

[5] When the presiding commissioner told petitioner he was identifying the "wrong" reasons for his conduct, petitioner tried to explain that "[i]t's intimidating talking with you" and he was nervous, but he understood those were not the actual reasons; the commissioner interjected that he was "easy to talk to" and they were "just having a conversation," and repeated that he was still not getting the "real" reasons from petitioner.

15

considering long term consequences of his actions," admitted being self-centered and failing to acknowledge others' needs and feelings, had "gained greater understanding of his addictive patterns and seemed to move away from denial and minimization of his addiction to alcohol," and that he recognized limitations in his ability to manage stress and anger and attended many self-help programs to address this problem.

The 2015 risk assessment reported that petitioner "exhibited a complex understanding of himself and his past behaviors" and related his view of circumstances leading to the life crime as beginning with his childhood experience of physical and emotional abuse and feelings of abandonment, insecurity and unworthiness, then turning toward increasing criminality and entitlement after his intervention in his stepfather's abuse of his mother. He told the evaluator that at the time of the murder he "wanted to prove to his criminal associates that he was able to extricate them from the situation" and "pointed to his feelings of anger, resentment, and entitlement, feelings that had grown from his youth," saying he "didn't care about the consequences," it was "only about me . . . the hate I had for myself and others," and that he was thinking, "If anybody got in my way, I will kill them." He recognized that the primary reason he hit his girlfriend was "desire for power and control" and that his inability to manage anger, along with association with troubled peers, contributed to his fights in prison—he was "a 'walking landmine' who would 'just blow' anytime he was challenged or confronted."

The 2017 risk assessment described petitioner as having "demonstrated enhanced insight into the causative and contributory factors to his past behaviors including the Life crime." observing that "[i]t seems he really took to heart what the last hearing panel said, and has been working to gain a deeper understanding of what factors drove his behavior in the Life crime." Petitioner told the evaluator that he was trying to prove himself to Grant, and "attributed his extreme violence to wanting to 'fit in' with his peer group." He saw his "underlying anger and low self-worth as factors driving his behaviors": "He recalled his parents always telling him that he was stupid, and that he would never amount to anything, well here he was now, and he wanted to be recognized." He said he had learned from childhood that "the best way to handle conflict was through violence,"

16

"mentioned impulsivity as a factor" and said "he 'didn't care about human life, and even though [his] intention was not to kill necessarily, [he] didn't see anyone else as value because nobody saw [him] as valuable." Petitioner recognized that " 'taking a high-powered rifle anywhere was not protecting [himself]" but rather "being a danger." He told the evaluator, "[a]t 19, I didn't have any values, I was not thinking about the harm I could have caused." When he saw a report about the crime on the news, he "felt ashamed and guilty, but more so, I didn't want to get caught. I realize that I murdered an innocent person, took him away from his wife and family. I didn't have problem solving skills, and when I came to prison, I was still angry and felt abandoned. Whenever I couldn't express myself appropriately I just lashed out." Petitioner said he now recognized "warning signs of anger, and other emotions, like racing heart, feeling sweaty, etc. In the past I always thought that was the bell to go and do something (like fight or flight—but choosing to fight). Now I recognize those as warning signs to become introspective and realize what is going on within me." Whereas in the past his increased heart rate would make him "feel the need to go and harm somebody," now he would "relax, reflect, and make a decision. Back then, I didn't have tools. My tools were guns and violence. Now I have the tools to make the right decisions."

The commissioners' only explanation for rejecting the consistent view of the psychologists that petitioner demonstrated insight into his offense and presented a low risk of future violence was the presiding commissioner's statement, "I don't think they're really getting it. No disrespect to the doctors but I do not agree with their assessment. I don't think you've addressed the causative factors of the crime." This insistence that petitioner's insight was lacking – the *sole* factor upon which the commissioners rested the denial of parole—notwithstanding the psychologists' views to the contrary, is particularly troubling in view of the fact that petitioner was a youth offender. (Pen. Code, § 3051.) Pursuant to Penal Code section 4801, subdivision (c), as it read at the time of petitioner's

2017 hearing,[6] "when a prisoner committed the life crime before attaining 23 years of age, the Board, in reviewing his or her suitability for parole, 'shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law.' ([Pen. Code,] § 4801, subd. (c); see also § 3051, subd. (f)(1) ['In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual'].)" (*Perez, supra*, 7 Cal.App.5th at p. 92.) The "hallmark features" of youth include " 'immaturity, impetuosity, and failure to appreciate risks and consequences,' as well as the capacity for growth and change." (*People v. Franklin* (2016) 63 Cal.4th 261, 283, quoting *Miller v. Alabama* (2012) 567 U.S. 460, 477.)

The 2017 risk assessment specifically addressed this requirement, stating that "[y]outh offender factors, such as hallmark features of youth, imperviousness to punishment, difficulty extricating from negative environments, and peer pressure certainly contributed to the emergence of and perpetuated his antisocial behavior. . . . While he was still culpable for his actions in shooting Mr. Ellingsen, the circumstances under which he committed that crime had a lot to do with his values, which were influenced by his upbringing and negative peer associations. He also lacked the tools necessary to resolve conflict in a constructive and prosocial manner, as that was not how he was raised, and he had no positive role models to otherwise emulate or learn from."

The Board paid lip service to the requirement that it consider youth factors, but the record gives no indication the Board actually did so, much less that it gave these factors "great weight." (Pen. Code, § 4801, subd. (c).) The commissioners rejected petitioner's

_____

[6] As of January 2018, Penal Code sections 4801, subdivision (c), and 3051 apply to offenders whose crimes were committed when they were under 25 years of age. (Stats. 2017, ch. 675, §§ 1, 2.)

18

attempts to explain his perceived need to prove himself and lack of regard for the value of life or consequences of his actions, seeking logical, rational reasons for petitioner's conduct that failed to allow for, much less give great weight to, the mindset of a 19-year-old drug dealer immersed in a violent, criminal lifestyle.

Penal Code section 4801, subdivision (c), also required the Board to give great weight to "any subsequent growth and increased maturity of the prisoner." In the opinion of the psychologist who evaluated petitioner in 2017, the "dramatic attitudinal and behavioral changes he implemented and has sustained for a protracted period of time surely help to mitigate any future risk for violence as it relates to the criteria set forth in [the youth offender] statute." As indicated above, petitioner had participated in, completed or facilitated numerous self-help programs, completed several vocational programs, earned a college degree and had become a certified substance abuse counselor and peer mentor. He had received numerous commendations for hard work, commitment and desire to help others. The psychologist noted that "as time goes on, [petitioner] continues to grow and mature, and utilize opportunities such as his last parole board hearing to continue exploring his past in order to gain a deeper level of self-understanding as to why he ended up the way he did. It is evident that he continues to try and better himself no matter the outcomes of situations, which is a positive and favorable quality that further mitigates his risk for engaging in future violence. His change genuinely appears intrinsically motivated and internalized."

The record clearly demonstrates that petitioner has long since disavowed the criminal conduct and values of his youth and dedicated himself to improvement of his own skills and internal resources and to providing help to others. He has expressed understanding of what caused him to commit a heinous crime as a 19-year-old, over 28 years ago, and remorse for taking an innocent life and the resulting pain he inflicted on the victim's family. Even without reference to the directives of Penal Code section 4801, this record reflects no support for the Board's finding of "no insight," and no evidence petitioner poses a current threat to public safety. Considering the contrast between the irrationality, impulsivity and recklessness of petitioner's offense as a 19-year-old, and the

19

evidence of his subsequent development of maturity and changes in attitude and conduct, the Board's hearing and decision in this case inspire little confidence that it took seriously the directive of Penal Code sections 3051 and 4801, subdivision (c), for it to provide a "meaningful opportunity to obtain release," with "great weight" given to "the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law."[7]

The Board's decision cannot stand.

## DISPOSITION

The decision of the Board is hereby vacated. The matter is remanded for a new parole suitability hearing consistent with due process of law and this decision. (See *Prather, supra,* 50 Cal.4th at p. 244.)

---

[7] This case, unfortunately, is not the first in which we have been called upon to observe the Board's apparent failure to treat the directives of the youth offender statutes as requiring more than empty acknowledgment. (*Perez, supra,* 7 Cal.App.5th at p. 93.)

20

                                _____
                                Kline, P.J.

We concur:


_____

Richman, J.


_____

Stewart, J.


*In re Poole on Habeas Corpus* (A152341)


Trial Judge:                         Hon. Morris Jacobsen

Trial Court:                            Alameda County Superior Court

Attorney for Appellant:                 Under Appointment by the Court of Appeal
                                        Michele Satris


Attorneys for Respondent:               Attorney General of California
                                        Xavier Becerra

                                        Gerald A. Engler
                                        Chief Assistant Attorney General

                                        Phillip J. Lindsay
                                        Senior Assistant Attorney General

                                        Sara J. Romano
                                        Supervising Deputy Attorney General

                                        Brian C. Kinney
                                        Deputy Attorney General